UNITED STATES of America,
Plaintiff-Appellee,

v.

Jack HALPERIN, Defendant-Appellant.

No. 28941.

United States Court of Appeals,
Fifth Circuit.

April 22, 1971.

Rehearing Denied May 14, 1971.

Charles W. Tessmer, Dallas, Tex., for defendant-appellant.

Eldon B. Mahon, U. S. Atty., B. H. Timmins, Jr., Charles D. Cabaniss, Andrew Barr, Asst. U. S. Attys., for plaintiff-appellee.

Before JONES, BELL and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

Jack Halperin appeals from a judgment of conviction and sentence based upon an indictment for receiving money knowing the same to have been taken from a national bank, Title 18, U. S.C., Section 2113(c). We find merit in the appeal and reverse and remand.

The evidence, viewed in a light most favorable to the government, Glasser v. United States, 1941, 315 U.S. 60, 62 S. Ct. 457, 86 L.Ed. 680, may be summarized as follows. On or about December 1, 1968, the First National Bank of Celeste, Texas, was broken into and approximately $4,500.00 in cash was taken from the bank, together with the contents of several safety deposit boxes consisting of money, coins, and jewelry. The burglary was committed by Albert Ray Roberts, Walter Allen Rich and Charles Dean Rollins, all of whom have been convicted and are now serving confinement sentences for the offense. Roberts and Rich testified for the government at Halperin's trial. Rollins was brought from a federal prison to Dallas for the trial, but the government did not list him as a witness or call him to the stand. The burglary was planned in a bar in Dallas, Texas. After the burglary, Roberts, Rich and Rollins returned to Dallas, Texas, taking a room at the Tower Motel. That night (Sunday, December 1, 1968), the three men went out drinking, and at a bar, Bev's Club, run by the appellant, Jack Halperin, they met with appellant and according to the testimony of Roberts and Rich, an agreement was made under which Halperin would exchange the coins taken in the burglary for paper money for a fifteen per cent charge. Roberts and Rich testified that another meeting took place early the next morning at the Tower Motel, where Halperin looked over the merchandise taken from the bank. Later that morning Rich testified that he accompanied Halperin and Rollins to a downtown Dallas bank (later identified as the National Bank of Commerce) where appellant exchanged the coins for paper money.

Two other witnesses testified that appellant was present at the Tower Motel early Monday morning, December 2, 1968. Sandra Chaney, a girlfriend of Rich, corroborated the testimony of Rich and Roberts by testimony that appellant was present at a Tower Motel room on Sunday night after the burglary and saw the displayed stolen merchandise. Mrs. Chaney was present in the room when Halperin arrived and saw the burglarized safety deposit boxes on the bed where appellant also could see them. She was also present during a conversation in which Halperin participated at which the discussion centered on seeking the release of Rollins, Roberts, and Rich from jail by posting a bail bond; she stated that Halperin "was afraid they might squeal on him".

Another government witness was Fayrene Wright who worked as a cocktail waitress in Bev's Club. Miss Wright testified that she dated appellant. She testified that she accompanied him on Sunday night, December 1, 1968, to see Chuck Rollins at the Tower Motel; Halperin told her on that occasion that Rollins was going to take some money (change) to the bank; after arriving at the motel room Halperin sat in a chair and she saw boxes on the bed and pieces of jewelry were displayed to her; she also saw some loose coins in the boxes.

Appellant Halperin testified that he knew Roberts, Rich and Rollins, that he had gone to the Tower Motel on Monday morning, December 2, 1968 but he did not see anything taken from the burglary of the bank and that he took Rollins and Rich to his bank later that morning so *they* could exchange a large amount of coins they had for paper money. He testified that he saw Roberts and Rich at the Hillcrest Hotel (owned

by Halperin) and that on one occasion he heard them talk to a barber who had been in Huntsville (Texas Department of Corrections) with Roberts. Appellant heard them talking "about a score". Later Rollins telephoned appellant and asked if he knew anyone who had a "torch" for sale. Halperin referred him to one Tony Rhodes. On cross-examination Halperin admitted that he had known Rollins previously "from being on the street, knowing him from other bars" and that he knew Rollins was a carpenter and had run a club. He stated that he knew of no other business in which Rollins engaged. When Rollins asked if he knew anyone who had a cutting torch for sale Halperin knew such a torch was used for cutting metal and that carpenters and roofers did not use them in their trade. Halperin also stated, in connection with hearing the conversation about the "score", that he "thinks it means something about a robbery"; he then went on to say that "they could have been talking about a football game".

Nick Doran was called by the defense as a character witness. Doran stated that he was formerly employed by the Dallas Police Department, that he had known Halperin for several years and that he had a good general reputation in the community for truth and veracity. Doran had managed Bev's Club for about a year after leaving the Police Department. On cross-examination, the government attorney questioned Doran as to being discharged from the Police Department for association with undesirable persons and was given a negative answer. This followed a question insinuating that Doran did not leave the Police Department voluntarily, which Doran denied: "Yes sir, I did". Later in the trial as part of its case on rebuttal the government offered personnel records of the Dallas Police Department as business records, Title 28, U.S.C., Section 1732. This incident is dealt with fully in our discussion, Part I, infra, and Note 1.

There was also evidence that on Monday, December 2, 1968, appellant made a deposit in the National Bank of Commerce of Dallas, Texas, in the amount of $550.00, $480.00 of that deposit being in coin. At this time the appellant also exchanged $600.00 in coin for $600.00 in paper money. Defense testimony showed that the appellant owned two lounges, a private club under lease, a vending machine company, and a motel, and that he often possessed considerable amounts of coins because of the nature of these businesses.

I. ATTEMPTED IMPEACHMENT OF THE DEFENSE WITNESS DORAN

The former policeman Doran was called as a character witness for the defense. During his direct examination he stated that he had left the Dallas Police Department voluntarily. On cross-examination Doran was asked whether or not, as a matter of fact, he had been asked to resign from the police force for association with undesirable persons. Doran responded in the negative.[1]

On rebuttal the government presented the testimony of Dallas Police Lieutenant Charles S. Bridges. His direct testimony, insofar as it concerns us here, was as follows:

(Examination by Mr. Timmins, Assistant United States Attorney)

Q  How are you employed, Mr. Bridges?

A  I am with the Dallas Police Department, lieutenant.

Q  How long have you been with the Dallas Police Department?

---

1.  Q  All right, sir. Now, then, as a matter of fact you didn't leave the employ of the Dallas Police Department voluntarily, did you, Mr. Doran?
    A  Yes, sir, I did.
    Q  Weren't you asked to resign for association with undesirable persons?

A  No, sir, I was not.
Q  You just decided to quit?
A  That's right.
Mr. Timmins:
    I have no further questions.

A   Will be thirteen years in November.

Q   All right, sir. And are you at the present time, that is, today, do you have custody and control of certain personnel records of the Dallas Police Department?

A   Yes, sir, I do.

Q   And have you produced certain of those personal records here in court with you at our request?

A   Yes, sir, I have.

Q   And at the time that you produced these personnel records, are they kept, prepared and kept, under your supervision and direction, under your custody and control?

A   Yes, sir.

Q   Is it the usual, ordinary, customary course of business in the Dallas Police Department to make and keep such personnel records?

A   Yes, sir, it is.

Q   All right. And do they reflect the day-to-day entries and business relating to personnel of the Dallas Police Department?

A   Yes, sir.

Q   And have you produced original records of the Dallas Police Department?

A   Yes, sir.

Q   And do they reflect entries and transactions occurring at or about the time appearing on such records?

A   Yes, sir.

Q   All right. Have you produced the personnel records of a former Dallas police officer by the name of Nickey P. Doran?

A   Yes, I have.

Q   All right, sir.

Mr. Timmins:

I will ask that this be marked for identification as Government's Exhibit 3.

(The instrument referred to was here marked Government's Exhibit No. 3 for identification)

Mr. Timmins:

And Government's Exhibit 4.

(The instrument referred to was here marked Government's Exhibit No. 4 for identification)

By Mr. Timmins:

Q   I will hand you what has been marked for identification as Government's Exhibits 3 and 4. Can you identify Government's Exhibit 3, please?

A   Yes, sir.

Q   All right. What is that?

A   This is a recommendation for disciplinary action against Officer Nickey P. Doran dated January 19, 1966 addressed to Chief Jesse E. Curry or J. E. Curry and is signed by former Deputy Chief George L. Lumpkin.

Q   Does that reflect certain complaints made against Mr. Doran during the time of his employment as a Dallas police officer?

A   Yes, sir, it does.

Q   Dating back to September 2, 1960?

A   Yes, sir.

Q   And continuing through some date in July of 1965?

A   Yes, sir.

Q   All right, sir. And I will ask you if you can identify Government's Exhibit 4.

A   Yes, sir. This is the original copy of the resignation letter of Officer Nickey P. Doran that was submitted on January 31, 1966.

Q   Does it reflect whether or not the resignation was requested?

A   Yes, sir, there was a footnote put on the letter stating resignation "requested while under investigation for non-payment of debts".

Mr. Timmins:

Government offers its Exhibits 3 and 4.

Mr. Burleson (defense counsel):

Your Honor, we would object to both of these for the reason that they are not material to the question of impeachment, that Mr. Timmins asked the man the reason that he resigned, and that was for associating with

known criminals, or some such, and that the Government Exhibit Number 3 reflects an inter-office memorandum that has nothing whatsoever to do with that, is based on debts, and is something completely different from what Mr. Timmins is basing his offer on. We object to Government's Exhibit Number 3 on that ground.

The Court:

All right.

Mr. Timmins:

It was offered to impeach Mr. Doran, who, as I recall, testified that he left the Dallas Police Department voluntarily by resignation.

The Court:

It is admitted for that purpose only, and you will consider it only for the purpose of impeaching the witness Nickey P. Doran as to that statement.

Mr. Burleson:

As to Government's Exhibit Number 4, Your Honor, we object to it because it apparently has some writing on it that is not known.

Could I take the witness voir dire and see if he knows where this writing came from?

The Court:

Yes.

Mr. Burleson:

Lieutenant Bridges, the writing that you said was at the bottom, is there any signature on there? Do your records reflect who made that?

The Witness:

As I recall, there is an initial to the left of it.

Mr. Burleson:

Do you recall whose initial that is?

The Witness:

No, sir.

Mr. Burleson:

You don't recognize that as being the the initial of any official of the Dallas Police Department, do you?

The Witness:

It looks like a "W".

Mr. Burleson:

Do you recognize it as being an initial—

The Witness:

No, sir.

Mr. Burleson:

—of any official of the Dallas Police Department?

The Witness:

No, sir, I don't know that to be a fact.

Mr. Burleson:

And you don't know whether that was put on there by somebody after January of 1966 or when it was put on there?

The Witness:

No, sir.

Mr. Burleson:

You don't know whether it was put on there yesterday?

The Witness:

No, sir, I don't.

Mr. Burleson:

You do not know and you can't tell the Court who it is that made that notation. Let me ask you. With reference to the letter, the letter is signed, is it not, up here above the notation?

The Witness:

Yes, sir.

Mr. Burleson:

And the other exhibit that the Court has already let in, that is signed, is it not?

The Witness:

Yes, sir.

Mr. Burleson:

You recognize George Lumpkin's signature, don't you?

The Witness:

Yes, sir.

Mr. Burleson:

Your Honor, we would move for the exclusion of Government's Exhibit Number 4 for the reason that it contains extraneous matters not shown to have been made by any person in au-

thority. If the Government wants to offer the top portion of it which is authenticated, we have no objection to that offer, but anything that is extraneous and can't be shown when it was done I think is inadmissible in this court.

Mr. Timmins:

May I be heard, Your Honor?

The Court:

Yes.

Mr. Timmins:

Mr. Bridges has testified that these are official records of the Dallas Police Department, and I would like to ask him one or two more questions with respect to—

The Court:

He said it reflected the events—

Mr. Timmins:

Yes, sir.

The Court:

—put on there at the time.

Mr. Timmins:

At the time or about the time of the transaction.

The Court:

At or about the time that they occurred.

Mr. Timmins:

Right.

The Court:

And this was such a record.

Mr. Timmins:

We think they are admissible for that purpose, limited purpose.

The Court:

Admitted for the sole purpose of impeaching the witness Nickey P. Doran.

Mr. Burleson:

Note our exception.

The Court:

All right.

By Mr. Timmins:

Q   All right. With respect to Government's Exhibit Number 3, the memorandum reflecting the disciplinary action, does that reflect both reprimands and suspensions of Officer Doran?

A   Yes, sir.

Q   And down at the bottom, Government's Exhibit Number 4, being the resignation of Nickey Doran addressed to the Chief of Police:

"I hereby submit my resignation from the Dallas Police Department effective close of business January 30, 1966.

Very truly yours,
Nickey P. Doran
Patrolman No. 1666".

What is written at the bottom of the page in ink?

A   "Requested while under investigation for non-payment of debts."

Mr. Timmins:

I have no further questions.

We have concluded that the admission of these records was error.

██  A witness may be contradicted on a material point by the testimony of other witnesses showing a contrary state of facts, in order to show that his statements were false and thus impeach his credibility. It is proper to admit evidence of any acts or circumstances which are inconsistent with the relevant testimony of the witness. Any evidence, otherwise competent, which in any respect tends to contradict the witness as to a material fact, is admissible for this purpose. The determination of what is admissible on rebuttal is primarily for the discretion of the trial court, and the appellate courts will not reverse the action of the trial court in the absence of an abuse of discretion. Wharton's Criminal Evidence, § 913.

██  In this case, however, we think that the evidence received was not rebuttal of Doran's testimony. We are further of the opinion that the documents did not qualify as business records under the codification of the shop-book rule, the Business Records Act, Title 28, U.S.C., Section 1732, and should have been excluded on that basis when timely

objection was made. The clear implication of the objection was that the records did not qualify under the statute, though the objection was not spelled out in those specific terms.

First, as to whether the documents impeached any statement of the witness Doran, we go back to the predicate laid during Doran's cross-examination. The points under inquiry were *whether he left the police department voluntarily,* which he affirmed, and *whether he had been asked to resign for association with undesirable persons,* which he denied. Proof to the contrary of either statement by competent evidence would have been admissible as impeachment. The documentary evidence from the police files, however, did not go to meet either segment of this predicate. Government Exhibit 3 was a recommendation dated January 19, 1966 by the Deputy Chief of Police that Officer Doran be indefinitely suspended, reciting a number of complaints during his 5 or 6 years on the force, mainly for failure to obey orders, drinking, debts owed, delinquent accounts, or bad credit record, but none involving undesirable associations. Exhibit 4 was Doran's signed typewritten resignation dated January 31, 1966, addressed to the Chief of Police and reading: "Sir: I hereby submit my resignation from the Dallas Police Department effective close of business January 30, 1966." This paper bore a handwritten notation at the bottom: "Requested —while under investigation for non-payment of debts", with an identifying initial, perhaps a "W", perhaps an "N", beside it which Lieutenant Bridges, the authenticating witness, could not make out and whose maker he could not identify.

Assuming for the moment that these exhibits, particularly the latter, qualified under Section 1732, they showed nothing whatever contradictory of Doran's statements, (1) that he was not asked to resign for association with undesirable persons, and (2) that he resigned voluntarily. Simply stated, the documents did not impeach the witness, and should have been excluded when timely objection was made. They were particularly damaging to the appellant Halperin when he was relying upon the witness Doran's testimony as to his previous good character to influence the jury to accept his version as to the critical element of guilty knowledge in preference to the version related by the confessed thieves who testified against him.

Secondly, we think that the police records in this instance did not qualify for admission into evidence under the business records exception to the hearsay rule. Police reports are "business records" under the Business Records Act, Title 28, U.S.C., § 1732. United States v. Martin, 5 Cir. 1970, 434 F.2d 275; Bridger v. Union Railway Company, 6 Cir. 1966, 355 F.2d 382. The police report need only have been made in the regular course of business and the person offering the report be in a position to attest to its authenticity. With these requisites present, the report is admissible. *Martin,* supra; *Bridger,* supra. Exhibit 3 was simply the complaint in the file made by the deputy chief of police against Doran, reciting numerous charges of violations of police regulations on various occasions, unsupported by any identification even of the complainant and not indicating in all instances whether or not the complaints were found to be justified or not. Counsel for Halperin offered to withdraw his objection to Exhibit 4 if it was limited to Halperin's resignation and the hearsay notation "Requested while under investigation for non-payment of debts" was expunged. The notation was not signed, and Lieutenant Bridges was not able to identify the initial beside it as being that of any official of the Dallas Police Department. Bridges did not know when the notation was made on the resignation letter. This was not shown to be a record "made in regular course of any business" or as a "memorandum or record of any act, transaction, occurrence, or event * * * at the time of such act, transaction, occurrence, or event, or within a reasonable time there-

after". Title 28 U.S.C., Section 1732. Regardless of the rule that police records ordinarily qualify as "business records", this unauthenticated, unidentified, hearsay notation should have been kept from the jury's eyes. Its effect was unfairly to denigrate Doran's credibility as a witness in a measure we can only guess at.

LaPorte v. United States, 9 Cir. 1962, 300 F.2d 878, cited by the appellee, is not inconsistent with our holding. *LaPorte* dealt with the admissibility of a Selective Service printed form from a registrant's folder titled "Order to Report for Civilian Work and Statement of Employer", upon which had been written the words "Did not report". The court ruled that the form was admissible to show that the registrant had not in fact reported for civilian work. In that case, however, the Personnel Officer of the Department testified that it was the practice, in the ordinary course of business, for one of the six or seven employees in the office to write "did not report" on the form when a registrant failed to report as required by the order. Thus in that case the regularity of the entry in the ordinary course of events gave it the necessary indicia of accuracy to permit its admission as an ordinary business record and as such an exception to the hearsay rule.

We are unanimous in the view that the improper receipt of government Exhibits 3 and 4 in evidence in this case was prejudicial to the appellant. The judgment of conviction will accordingly be reversed and the cause remanded for new trial.

## II. THE INDICTMENT

My brothers Jones and Bell go no further in this case and, as indicated, our reversal rests solely on the admission of the improper impeaching material, government Exhibits 3 and 4. The views in this part of this opinion are my own, not shared by the remainder of the panel.

The appellant urged that the indictment was fatally defective as failing to allege one of the material elements of the offense as set forth in Title 18, Section 2113(c). The government responds that the appellant had waived or abandoned any objection to the indictment in the district court. The government further argues that the appellant was not misled; that he could not reasonably understand but that he was being charged with stealing property which belonged to the First National Bank of Celeste. See indictment, infra, footnote 4. The majority accepts the government's position on this matter, and is of the view that no prejudicial error is demonstrated. For reasons developed below, I differ with the other members of the panel as to this point.

Speaking then for myself alone, I am of the firm opinion that the conviction must be set aside as based upon an indictment which failed to charge an offense under Title 18, U.S.C., Section 2113(c). The indictment did not allege commission by Halperin of an offense against the United States because it failed to charge that the money taken from the National Bank *belonged to or was under the care, custody, control, management, or possession of the bank.* Reading Title 18 U.S.C., Section 2113(c) in conjunction with the preceding subsection, Title 18, U.S.C., Section 2113(a), as it must be read, since the offense denounced in subsection (c) is defined by reference to subsection (b), this was fatal. Title 18, U.S.C., Section 2113(b) makes it a crime to steal anything of value belonging to, or in the care, custody, control, management, or possession of any bank,[2] while Section 2113(c) makes it a crime to receive, possess, conceal, store, barter, sell, or dispose of any property knowing said property to

---

2. "Whoever takes and carries away, with intent to steal or purloin, any property or money or anything of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both; * * * *"

have been taken from a bank in violation of subsection (b).[3] I emphasize that the language of the statute is "taken from a bank * * * in violation of subsection (b) of this section".

The Grand Jury's indictment [4] alleged only that Halperin knowingly did receive, possess, and dispose of a sum of money which had been taken and carried away from the subject national bank.[5] Proof of the charge laid in the indictment would not require proof of the statutory offense, receipt of property belonging to or under the care, custody, control, management or possession of the bank. The allegation in the indictment would be met by proof that the property taken from the bank was the personal property of a bank officer or employee, left in the bank for reasons unconnected with the functions of the bank, or funds which were in the possession of a customer inside the bank before requisite control had been assumed by the bank.

It is a fundamental of the law that an indictment must set forth each component of the offense charged and that there must be proof of each such element. Failure both to allege and prove each element vitiates a conviction. See, e. g., Russell v. United States, 1962, 369 U.S. 749, 763–764, 82 S.Ct. 1038, 8 L.Ed.2d 240; Honea v. United States, 5 Cir. 1965, 344 F.2d 798; Walker v.

United States, 5 Cir. 1965, 342 F.2d 22. I would reverse on this ground as well as the ground set forth in Part I, as to which all members of the panel are in accord.

Reversed and remanded.

JONES, Circuit Judge:
I concur in the result.

---

3. "Whoever receives, possesses, conceals, stores barters, sells, or disposes of, any property or money or other thing of value knowing the same to have been taken from a bank, or a savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker."

4. "The Grand Jury charges:
"On or about the 2nd day of December, 1968, in Dallas County, Texas, in the Northern District of Texas, Jack Halperin, defendant, wilfully, knowingly, and unlawfully did receive, possess and dispose of the approximate sum of $1,000, which had been taken and carried away, with intent to steal and purloin, from the First National Bank of Celeste, Celeste, Texas, a national bank, the said Jack Halperin then knowing the said money to have been so taken.

"A violation of Title 18, United States Code, Section 2113(c)."

5. The appellant filed what was termed "a demurrer" to the indictment in the district court. It was treated by court and counsel as a motion to dismiss. Although the government asserts that the demurrer was abandoned, the record does not appear to support this claim. The trial court apparently failed to rule on the demurrer and this omission does not seem to have been called to the court's attention. Hence I find no indication that Halperin abandoned or waived his objection. No obstacle exists to consideration of this issue on appeal. I see the defect in the charge as so serious that I would be inclined to say that the conviction should not stand, even absent objection to the indictment, but it is unnecessary to make this determination in view of the state of the record.