**Arthur Wayne CARSON, Petitioner-Appellant Cross-Appellee,**

v.

**Officer POLLEY, ET AL., Respondents-Appellees Cross-Appellants.**

No. 81–1284.

United States Court of Appeals, Fifth Circuit.

Oct. 18, 1982.

Rehearing Denied Nov. 16, 1982.

Charles W. Cunningham, Alan S. Loewinsohn, Dallas, Tex., for petitioner-appellant cross-appellee.

Sue Lagarde, J. Steven Bush, Asst. Dist. Attys., Dallas, Tex., for respondents-appellees cross-appellants.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Arthur Carson brought this civil rights action under 42 U.S.C. § 1983 against the Dallas County Sheriff and four of his deputies and a Dallas County Constable and

three of his deputies. Carson alleged that he suffered injuries because the defendants used excessive force when arresting him and booking him into jail. In addition to the federal civil rights claims, Carson appended several state law claims growing out of the same incident.

In the first trial of this case, Carson recovered a verdict of $31,725.00. On motion of the defendants, the district court granted a new trial because the jury had considered several exhibits that had been ruled inadmissible and because of an erroneous evidentiary ruling. The second trial resulted in a jury verdict in favor of all defendants. Carson appeals from this judgment, arguing that the district court should have rendered judgment based on the jury's verdict in the first trial. Alternatively, Carson argues that procedural and evidentiary errors attending the second trial require that we order a third trial in this case. The defendants have cross-appealed on the issue of sanctions entered for noncompliance with discovery requests.

## I. Facts

The events of Carson's arrest were hotly disputed at trial. We present the facts as asserted by Carson without purporting to resolve the conflicts. On Friday, February 10, 1978, Arthur Carson, while on his way to visit his mother-in-law, took a short-cut through the parking lot behind a precinct police station in Dallas, Texas. Earlier that day, police officers had observed someone tampering with a car in the station's parking lot. Mistaking Carson for this person, two plain clothes officers emerged from an unmarked car and told Carson he was under arrest. Because neither officer identified himself or informed Carson of the charges, Carson walked off. One of the officers then grabbed Carson's wrist and twisted it behind his back. The two tumbled to the ground as Carson attempted to free his arm. At this point, help in the form of three or four more officers emerged from the precinct station. The officers apprehended Carson and subdued him. On Carson's account, they did so by repeatedly hitting and kicking him.

Handcuffs were placed on Carson's wrists and ankles. The officers carried him into the station house where the two sets of cuffs were connected behind his back with a third set of handcuffs. Thus bound, Carson was left face down in an empty room. Three defendants—Deputy Constables Flatt and Crow, and Assistant Chief Deputy Constable Jack Thomas, were among the officers who participated in the arrest. A fourth defendant, Constable Vines, was the official in charge of the precinct station.

Carson was then transported to the Dallas County Jail. During the trip, Carson maintains, one of the officers grabbed him from behind and choked him into unconsciousness. On arrival at the jail, Carson was pushed out of the car and landed on his face on the parking lot. The officers carried Carson into the jail, using the third set of handcuffs as a handle and transporting him like a suitcase.

In the jail, sheriff's department personnel took charge of Carson. Carson's handcuffs were removed and he was taken to the book-in center, also known as the "shakedown" room. There, Carson testified, Deputy Sheriff Polley approached Carson and pushed him towards the back of the room. Carson requested to use a phone, but Polley's only response was to throw him jail coveralls and to tell him to "shut up". Carson still did not know why he had been arrested. Carson testified that Polley then struck him three times in the eye, knocking him over a bench. More officers then entered and kicked and hit Carson. Carson was again choked into unconsciousness. When Carson awoke, he was in solitary confinement. But for one visit to a nurse, Carson was left incommunicado in solitary confinement for three days until the following Monday. In addition to Polley, Carson alleged that Deputy Sheriffs Holley, Ingram, and Ellis were involved in the jail house events. Another defendant, Sheriff Carl Thomas, was the official responsible for the Dallas County Jail.

In July 1978, Carson pleaded guilty to two counts of aggravated assault for his conduct in the arrest. In August 1978, Car-

son filed this suit pro se, naming only Deputy Sheriff Polley as a defendant. One day after the complaint was filed, the district court appointed counsel for Carson. Carson's counsel then filed two amended complaints, naming the additional defendants in this suit.[1] The district court denied leave to file a third amended complaint approximately one month before the first trial. The third amended complaint sought to add a claim against Sheriff Carl Thomas that he negligently employed certain of the defendants whom he knew to have violent tendencies.

After a trial at which the jury awarded Carson $31,750, the district court granted the defendants' motion for a new trial. Because the jury had reached a verdict in favor of two defendants in the first trial, Sheriff Thomas and Constable Vines,[2] the district court ordered that these defendants not be retried. At the second trial, the jury returned a verdict in favor of all of the remaining defendants. Carson's motion for a new trial was denied, and this appeal followed. Carson moved for leave of the district court to appeal in forma pauperis, but the district court denied this motion.

## II. The First Trial

We first consider Carson's argument that the district court abused its discretion in granting a second trial in this case. After the first trial ended, the defendants discovered that several exhibits the court had ruled inadmissible had not been removed from the exhibit boxes and, therefore, were considered by the jury during deliberations. The exhibits fell into two categories. First,

Carson had attempted to introduce prisoners' complaints and personnel reports about two deputy sheriff defendants, Holley and Polley. These reports and complaints dealt with occasions on which Holley and Polley used excessive force on prisoners. The district court had refused to admit these reports. Second, the defendants had attempted to introduce Carson's pleas of guilty to aggravated assault on the police officers who arrested him in February 1978. The court also ruled these guilty pleas inadmissible.

Despite these rulings, both the reports and the pleas remained in the exhibit boxes and were considered by the jury. Before the jury retired to deliberate, the court had invited counsel for both parties to examine the exhibit boxes and purge them of inadmissible exhibits. Carson's counsel had declined the invitation; the defendants' counsel could not remember having checked the exhibit box when questioned at a post-trial hearing. At any rate, the discovery that the exhibit boxes contained inadmissible exhibits was made only after the jury had concluded its deliberations.

The district court based its granting of a new trial on two grounds. First, the court believed that the personnel reports and prisoner complaints against the sheriffs were more prejudicial than probative. The jury's ability to consider them in assessing the credibility of the defendant law enforcement officers was of significance to the trial. In the court's view, all defendants were prejudiced by the jury's improper consideration of these exhibits. Second, the

---

1. Carson alleged three separate causes of action under § 1983. First, Carson alleged that he was arrested without probable cause and subsequently assaulted without cause, by Deputy Constables J. Thomas, Crow, and Flatt. Second, Carson alleged that he was assaulted during the book-in process at the jail by defendants Ellis, Holley, Polley, and Ingram, all deputy sheriffs. Third, Carson alleged that he was cruelly and unusually punished by subjection to solitary confinement by Deputy Sheriffs Ingram and Ellis. Carson alleged three separate conspiracies under 42 U.S.C. § 1985, but none of the conspiracy theories was submitted to the jury.

Carson also alleged three state-law claims. First, Carson alleged assault and battery against all defendants, except Sheriff Carl Thomas and Constable Vines. Second, Carson alleged unlawful imprisonment against Deputy Sheriffs Polley, Ingram, and Ellis and Deputy Constables Flatt and Crow. Finally, Carson alleged vicarious liability claims against Sheriff Thomas and Constable Vines for the actions of their employees.

2. Sheriff Thomas and Constable Vines had been charged only with vicarious liability. Neither defendant had actually been involved in the events of Carson's arrest and confinement in the jail.

court believed that it had erred during the first trial in refusing to admit Carson's pleas of guilty to aggravated assault on two of the defendants in the suit. Even though the guilty pleas did in fact go to the jury, the defendants were prejudiced by their inability to mention the pleas in argument to the jury.

 A district court, of course, has power to grant a new trial when the jury has inadvertently considered inadmissible evidence, and the evidence was prejudicial to the losing party. *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940); *DeVasto v. Faherty,* 658 F.2d 859, 864 (1st Cir. 1981). Our review of a district court's decision to grant a new trial is broader than our review of a district court's denial of a new trial, but the standard remains one of abuse of discretion. *Reeves v. General Foods Corp.,* 682 F.2d 515, 519 n.6 (5th Cir. 1982); *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir. 1982); *Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d 360, 362 (5th Cir. 1980). The difference in our standard of review of orders granting new trials and those denying new trials stems from our respect for a verdict by a properly functioning jury. When the trial court grants a new trial because of a disagreement with the jury over the interpretation of the evidence, we review such a decision carefully to ensure that the party who persuaded the jury is not unfairly stripped of its verdict. A trial court's denial of a new trial, in contrast, places the court's judgment in line with the jury's. A ruling against a new trial, therefore, is entitled to great deference.

Here, the primary rationale for reviewing grants of new trials more searchingly than denials of new trials is not present. The district court did not reject the jury's verdict because the court differed with the jury on the evidence. Rather, the court granted a new trial because the jury considered evidence that had been ruled inadmissible and because the defendants were denied an opportunity to argue an evidentiary point to the jury that was important to their case.

Carson makes three specific arguments against the district court's decision to grant a new trial. First, Carson argues that the defendants waived the right to complaint of the jury's consideration of the inadmissible personnel reports and prisoner complaints because the defendants had an opportunity to remove these exhibits from the exhibit box but failed to do so. We cannot accept the waiver argument on these facts.

 A defendant's failure at trial to prevent the harm raised in a motion for new trial may be considered in deciding the motion. *See Frankel v. Lull Engineering Co.,* 334 F.Supp. 913, 929 (E.D.Pa.1971), *aff'd,* 470 F.2d 995 (3d Cir. 1973). For example, a party may not be heard to argue on a motion for a new trial that the jury improperly considered inadmissible evidence if the party failed to object to the admission of that evidence at trial. *See Brescia v. Ireland Coffee-Tea, Inc.,* 73 F.R.D. 673, 676 n.7 (E.D.Pa.1977). But this is not a case in which the defendants raised an evidentiary matter for the first time on a motion for a new trial. Rather, the defendants successfully excluded certain of the plaintiff's exhibits at trial. Both plaintiff and defendants were requested by the court to ensure that the jury did not consider exhibits that had been ruled inadmissible. We cannot pin the entire blame on the defendants when the proffered personnel reports, after all, were Carson's. Carson, no less than the defendants, was at fault in failing to check the exhibit box before the jury retired. This is not a case where a defendant "sandbagged" the court by tactically reserving an objection until after the jury returned its verdict. We find no waiver of the defendants' right to argue for a new trial based on the jury's consideration of the inadmissible reports.

Second, Carson argues that the inadmissible reports pertained only to two deputy sheriffs, and, therefore, their prejudicial effect was limited to those two. Consequently, Carson argues, if a new trial was to be granted at all, it should have been granted only as to the two defendants named by the reports and prisoner complaints.

We do not agree that the taint of the reports can be so easily confined to the two named defendants. While the prejudicial impact of the reports plainly falls most heavily on the deputy sheriffs named in them, the district court believed that the taint of these reports spread to other of the defendants. The credibility of Holley and Polley was important not only to their own defenses but also to the defenses of the other defendants. By reducing the credibility of these two defendants, the reports had a prejudicial effect on the defendants who relied in part on the testimony of Holley and Polley.

But Carson argues that, at most, the prejudicial impact of the reports was limited to the deputy sheriffs and had no effect on the deputy constables. Carson stresses that the trial involved two separate alleged violations of his constitutional rights: the events of his arrest, which involved the deputy constables, and the events in the shakedown room at another locale, which involved the deputy sheriffs. These two events were separate in time and place. We accept Carson's theory of his case but still believe that the credibility of the deputy sheriffs could have had an impact on the jury's findings on the deputy constables. This case turned on the jury's assessment of the relative credibility of the word of law enforcement officers against the word of Carson. The attack on the deputy sheriffs' credibility, therefore, could have contaminated the jury's perception of other law enforcement officers in the case. The district court so concluded, and we do not find this to be an abuse of discretion.

Third, Carson maintains that the defendants may not complain of their inability to argue Carson's two guilty pleas to the jury because no final ruling against the admission of the pleas was made by the district court. In addition, Carson contends that since the jury inadvertently saw his guilty pleas anyway, the defendants' loss of the opportunity to refer to the pleas in closing argument was harmless error. These arguments are unpersuasive. The district court, as the record reflects, did not allow the defendants to introduce the guilty pleas in the first trial. In any event, the jury's opportunity to see the pleas is not a substitute for the argument of counsel. The significance of the pleas as an admission by Carson might have been put to useful advantage in argument to the jury.

The verdict of a jury should not lightly be set aside. When, however, the inadvertence of both parties leads the jury to consider evidence that the court had refused to admit, the trial court may exercise its discretion to order a new trial if the inadmissible evidence worked prejudice to one of the parties. When the inadmissible evidence problem is coupled with a trial court's post-verdict reversal of an order excluding evidence that should have been admitted, we see no basis for disturbing the district court's decision to allow a second jury to hear the admissible evidence. We find no abuse of discretion by the district court.

### III. The Second Trial

Carson argues that he is entitled to a new, third trial because the district court at the second trial erroneously excluded certain exhibits offered by Carson and also erroneously admitted an exhibit against him. Carson further maintains that juror misconduct requires granting him a new trial. We agree that evidentiary error at the second trial forces us to order a third trial in this case.

### A. Departmental Performance Ratings on Deputy Sheriffs Ellis and Holley

Carson sought to admit two Dallas County Sheriff's Department performance evaluation reports, one on the defendant Holley and one on the defendant Ellis. Holley's performance evaluation report, dated July 15, 1977, commented that Holley needed to "work on controlling temper and personal feelings," because he "tends to get into arguments with inmates, lets his temper flare up too quickly." Ellis' performance rating, dated June 27, 1975, indicated that Ellis "is a good officer, however he

needs to learn to control his temper. This affects his public contact."[3] The district court declined to admit these performance reports, finding them inadmissible under Fed.R.Ev. 404.[4] We hold that the district court should have admitted these exhibits and its failure to do so affected substantial rights of Carson, thus warranting reversal. *See* Fed.R.Ev. 103(a); *Crumpton v. Confederation Life Ins. Co.,* 672 F.2d 1248, 1253 (5th Cir. 1982).

 Both performance evaluation reports were admissible, although for different purposes. The report as to Deputy Sheriff Holley tended to show Holley's *intent* to do harm to Carson when booking him at the jail, and, therefore, was admissible under the "intent" exception to the general rule against character evidence. *See* Fed.R.Ev. 404(b); *United States v. Beechum,* 582 F.2d 898 (5th Cir. 1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). The performance report as to Ellis contradicted Ellis' testimony on a material issue, and, therefore, was admissible to impeach. Fed.R.Ev. 608(b); *United States v. Opager,* 589 F.2d 799, 802 (5th Cir. 1979). The district court abused its discretion in ruling otherwise.[5]

We recently summed up the rules applicable to the admission of extrinsic character evidence for purposes other than to prove conduct in conformity with character:

Rule 404(b) provides that "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, planning, knowledge, identity, or absence of mistake or accident." In *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir. 1978) (en banc), *cert. denied,* 440 U.S. 920 [99 S.Ct. 1244, 59 L.Ed.2d 472] (1979), this Court construed the rule in light of the other rules of evidence and held that Rule 404(b) calls for a two-step test: "First, it must be determined that the extrinsic evidence offense is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403."

*United States v. Emery,* 682 F.2d 493, 496–97 (5th Cir. 1982) (footnote omitted). *See also United States v. Clemons,* 676 F.2d 122, 123 (5th Cir. 1982); *United States v. Wasler,* 670 F.2d 539, 542 (5th Cir. 1982); *United States v. Guerrero,* 650 F.2d 728, 732 (5th Cir. 1981).

 Carson offered the performance evaluations as extrinsic evidence of the intent of two of the defendants to commit an

---

**3.** These reports were not the same exhibits that inadvertently reached the jury in the first trial.

**4.** Rule 404 provides:

 (a) **Character evidence generally.** Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity—therewith on a particular occasion, except:

 (1) **Character of accused.** Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

 (2) **Character of victim.** Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

 (3) **Character of Witness.** Evidence of the character of a witness, as provided in rules 607, 608, and 609.

 (b) **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**5.** Carson argues that the exhibits were admissible on the issue of punitive damages. Under clear precedent in this Circuit, the exhibits plainly were not admissible for this purpose alone. *See Brown v. Miller,* 631 F.2d 408, 412 (5th Cir. 1980). Carson also argues that the exhibits were admissible to rebut the defendants' contention that they acted in self-defense. We treat this issue below.

assault and battery on Carson.[6] Intent, of course, may be shown through extrinsic proof of prior acts. Fed.R.Ev. 404(b); *United States v. Ortega-Chavez*, 682 F.2d 1086, 1091 n.6 (5th Cir. 1982). The theory of Carson's case was that the force used by the deputy sheriffs was excessive and was prompted by irrational factors. The defendants countered by attempting to show that the deputy sheriffs responded coolly and reasonably to an obstreperous detainee. One key issue, therefore, was whether the sheriffs reacted to Carson with excessive and unfettered hostility, or with reason and control. This issue is, in part, a matter of intent. The question is whether the performance evaluations were relevant to this issue of intent.

We are guided in answering this question by *United States v. Beechum, supra. Beechum* was a criminal case. The defendant was a mailman charged with unlawful possession of a silver dollar known to be stolen from the mails. When the defendant was arrested, two unsigned credit cards were found on his person, along with the silver dollar. Both credit cards had been mailed to addresses on the defendant's delivery route ten months, earlier. Neither had arrived. At his trial, the defendant denied that he intended to retain the silver dollar, insisting that he planned to turn it in to the postal authorities. The government introduced the credit cards found in defendant's possession as evidence of his intent to retain the silver dollar without returning it.

We held, after consideration en banc, that the credit cards were admissible to show intent under Fed.R.Ev. 404(b). We began by defining how an extrinsic offense may be relevant to the proof of intent behind a subsequent act:

> [T]he relevancy of the extrinsic offense derives from the defendant's indulging

himself in the same state of mind in the perpetration of both the extrinsic and the charged offenses. The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense.

582 F.2d at 911 (footnote omitted).

In *Beechum* we went on to hold that once extrinsic evidence is found relevant to intent, it must be subjected to the balancing test of Rule 403.[7] The holding in *Beechum* directs us now to look at the incremental value of the extrinsic proof in showing intent, the similarity of the prior act to the charged act, with respect to intent, and the time elapsed between the extrinsic and the charged acts. Probative value must then be weighed against prejudicial impact: the power of the offense to "incite the jury to irrational decision by its force on human emotion." 582 F.2d at 917.

In so applying *Beechum* to our case, we find that the performance evaluation report on Deputy Sheriff Holley was relevant to his intent. Loss of temper and consequent intentional hostility towards other detainees on earlier occasions made it more likely that a similar intent was present in Holley's conduct towards Carson. Moreover, in the Rule 403 balance, the report's probative value outweighs its possible prejudicial impact. The report was recent and specifically referred to Holley's relations with prisoners. It was of solid value in proving Carson's case, yet there were no horrifying details that would predictably inflame the jury's passion.

We reach a different conclusion, however, as to the relevance of the Ellis report to Ellis' intent. The Ellis report expressed only a general statement on Ellis' temper. It was recorded three years before the Carson arrest. It referred only in most general

---

**6.** Carson had pleaded a state law assault and battery claim under the district court's pendent jurisdiction. Intent is an element of an assault and battery under Texas law. *Biggins v. Gulf, C & SF Ry. Co.*, 102 Tex. 417, 118 S.W. 125 (1909).

**7.** Fed.R.Ev. 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

terms to "public contact," not solely with prisoners. The probative value of this report on Ellis' intent was slight. Because of the attenuated probative value, even the slight prejudice that the report might engender warranted excluding it.

 Thus, the Holley performance evaluation report should have been admitted as substantive evidence of Holley's intent in his actions in connection with the arrest of Carson. The Ellis report was properly excluded from admission as substantive evidence under Fed.R.Ev. 403.

We now consider whether the reports should have been admitted to impeach the deputy sheriffs. We hold that one report was admissible to impeach Ellis' testimony on a material issue. Ellis testified at trial that he had no recollection of the events surrounding Carson's booking-in at the Dallas County Jail. The following interchange then took place:

Q: And you're not testifying under oath today that it's impossible that you used excessive force and lost your temper while helping book in Mr. Carson, are you?

A: It's impossible that I lost my temper, sir.

Q: Well, you have had problems in the past with other prisoners; isn't that correct, learning to control your temper?

A: No, sir.

Ms. Lagarde: Your honor, I object to this. I think that's improper, and I would object to it. I think he should restrict his questions to what happened in this case; those are the issues before the Jury.

The Court: Sustain the objection.

After this ruling, Carson sought to admit the performance evaluation report as extrinsic evidence that contradicted Ellis' testimony on a material issue. The district court refused to allow the evidence to be admitted.

Fed.R.Ev. 608(b) generally governs the admission of extrinsic evidence going to a witness's credibility.[8] We have held, however, that when extrinsic evidence contradicts a witness's testimony on a material issue, the evidence is admissible without regard to Rule 608(b). *United States v. Opager,* 589 F.2d 799, 802–03 (5th Cir. 1979). As we noted in *Opager,* "The application of Rule 608(b) to exclude extrinsic evidence of a witness's conduct is limited to instances where the evidence is introduced to show a witness's general character for truthfulness .... Rule 608(b) should not stand as a bar to the admission of evidence introduced to contradict, and which the jury might find disproves, a witness's testimony as to a material issue of the case." *Id.* at 801–03.[9]

8. Rule 608 provides:

(a) **Opinion and reputation evidence of character.** The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

(b) **Specific instances of conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of an-

other witness as to which character the witness being cross-examined has testified.

The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility.

9. *Opager* involved a defendant's attempt to introduce business records that showed that the defendant and an undercover agent did not work together during 1974. The business records undermined the undercover agent's contention that he had witnessed drug dealing by the defendant during that year. 589 F.2d at 801. *Opager,* therefore, concerned extrinsic evidence that not only contradicted (and thereby impeached) a witness' testimony, but also constituted substantive evidence of the relationship between the defendant and the informer.

*Opager* also applies, however, to cases in which the extrinsic evidence comes in solely as

Here, the likelihood that Ellis would lose his temper and overreact to a prisoner was a material issue in the case. Ellis' flat denial that it would be possible for him to lose his temper spoke to that issue. The district court should have allowed Carson to introduce contradictory extrinsic evidence on that point to impeach Ellis.

■ The impeachment value of Holley's performance evaluation report, however, stands on a different footing. Holley never testified one way or the other on the possibility that he would lose his temper with a prisoner. Carson points to several statements made by Holley that he claims contradicts the performance evaluation report. On review of the record, however, these statements were simply denials by Holley that he actually hit or kicked Carson, not denials of a hot temper. Thus, the performance evaluation report does not contradict Holley's testimony and was properly excluded as impeachment evidence, although as set out above, it should have been admitted as tending to prove intent.

■ Carson makes the additional contention that the evidence of bad tempers of the two deputy sheriffs is admissible to rebut their allegations that they used force against Carson in self-defense.[10] Our reading of the applicable rules of evidence does not support Carson's theory. We give it only brief attention because we have already held the evidence should have been admitted on other grounds.

■ Rule 404(a), Fed.R.Ev., bars the introduction of character evidence to show that a person acted in accord with his character on a particular occasion. The rule's exclusion of such evidence applies to both criminal and civil cases. *Reyes v. Missouri Pacific R. R. Co.,* 589 F.2d 791, 793 (5th Cir. 1979). Under the general policy of excluding character evidence, evidence of Holley's and Ellis' bad tempers would not be admissible to show that their actions toward Carson conformed to their bristly characters, even when self-defense is at issue.

Rule 404(a) contains three exceptions to the general ban on the use of character evidence to show action in conformity with character. The commentators have largely viewed the exceptions as applicable only to criminal cases, *see* 2 Weinstein & Burger, *Weinstein's Evidence,* ¶ 404[03], pp. 404–20 (1981), 10 Moore's Federal Practice § 404.-01[5.–1]–(a), pp. 90–92 (1982), although the wisdom of this limitation has been questioned, 22 Wright & Graham, Fed.Prac. & Pro. § 5236 p. 389 (1978). We have held that when a central issue in a case is "close to one of a criminal nature," the exceptions to the Rule 404(a) ban on character evidence may be invoked. *See Crumpton v. Confederation Life Ins. Co.,* 672 F.2d 1248, 1253 (5th Cir. 1982).

The circumstances under which quasi-criminal conduct warrants the introduction of character evidence in a civil suit under Rule 404(a) may not always be easy to

---

impeachment. *Opager* relied on prior Fifth Circuit authority, *e.g., United States v. Halperin,* 441 F.2d 612, 617 (5th Cir. 1971). *Opager's* reliance on *Halperin* reveals that the purpose of admitting extrinsic evidence that contradicts a witness's testimony is to prevent a witness from lying with impunity about a material issue in a case. 589 F.2d at 802.

10. Carson relies principally on *McCormick on Evidence,* Section 193 at 461 (2d Ed. 1972):
 Similarly, when on a plea of self-defense or otherwise, there is an issue as to who committed the first act of aggression, most courts (regardless of their alignment on the general question) seem to admit evidence on the good or bad reputation of both plaintiff and defendant for peacefulness as shedding light on their probable acts.

Such evidence has been held admissible in criminal cases. *United States v. Greschner,* 647 F.2d 740, 741 (7th Cir. 1981). *See also Smith v. United States,* 161 U.S. 85, 16 S.Ct. 483, 40 L.Ed. 626 (1896) (evidence of victim's reputation for violence is admissible to support a claim of self-defense, particularly if the reputation of the victim is known to the defendant). *But see Avila v. Knight,* 475 F.Supp. 1054, 1055 (S.D.N.Y.1979) (in a civil rights case, evidence of plaintiff's propensity for violence was not relevant to defendant's self-defense claim because the defendant conceded that he had no awareness of the plaintiff's propensity for violence which would have led the defendant to defend himself).

draw. *Cf. Croce v. Bromley Corp.,* 623 F.2d 1084 (5th Cir. 1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981) (allowing evidence of character traits in a civil negligence suit in order to present the case fairly to the jury). Here, however, we believe that the assault and battery with which the defendants in this suit are charged falls "close to one of a criminal nature." Therefore, we apply the character evidence exceptions of Rule 404(a). Even with the exceptions, however, the performance evaluation reports tendered by Carson are not admissible for showing conduct in conformity with character.

■■■ Of the three exceptions allowing the use of character evidence under Rule 404(a), only one has any bearing on Carson's exhibits. Rule 404(a)(1) allows an *accused* to introduce evidence on a pertinent trait of his character to defend against a criminal charge, and then permits the prosecution to rebut such evidence once the accused has presented it. Here, no substantial direct testimony was presented by the defendants as to their characters for temperaments or peacefulness. The only evidence even resembling an opinion on character came out on cross-examination when Carson elicited from Ellis a statement that it was impossible that Ellis could lose his temper. Ellis' simple statement, however, presents too tenuous a basis for holding that Ellis opened the door to an attack on his character for temperance. Even though this statement rendered Ellis subject to impeachment, as we have held above, it did not constitute a sufficient placing of his character at issue to justify the admission of extrinsic evidence to attack Ellis' character. *Cf. Gray v. Sherril,* 542 F.2d 953 (5th Cir. 1976) (in a civil rights action against police officers, the plaintiff put his character for quarrelsomeness at issue by testifying that he was calm and reasonable, thus opening the door to rebuttal evidence; no citation to the Federal Rules of Evidence). As to Holley, there is no testimony even colorably resembling character evidence. The performance evaluation report, therefore, was not admissible to attack his character.

To sum up, the performance evaluation reports should have been admitted (a) against Holley to show his intent, and (b) against Ellis to impeach his denial that he could lose his temper. The reports were not admissible to show the character of either Holley or Ellis for the purpose of proving that each acted in conformity with his character. The evidentiary errors relating to these exhibits were of significance to plaintiff's case and require us to direct a new trial.

### B. Carson's Alleged Knife

Carson also objects to the district court's decision to admit into evidence a knife as "similar" to a knife allegedly found on Carson's person when he was arrested. Deputy Constable Jack Thomas testified that he confiscated a knife from Carson at Carson's arrest. Thomas also stated that the knife was visible as a bulge in Carson's pants pocket before the arrest was made. Carson fully denied having a knife in his possession during the arrest, and specifically denied that the knife identified by Thomas belonged to him.

The knife was relevant to two issues in the case. First, Carson charged that the deputy constables had arrested him without probable cause. The constables asserted that Carson was seen with a tool in his hand that they believed was used to open locked car doors, which tool later turned out to be the knife. Carson's possession of the knife thus had relevance to the officers' probable cause to arrest Carson for supposedly breaking into a car on the precinct station parking lot. Second, Carson contended that the officers used excessive force in subduing him after the arrest. That a knife was seen on Carson's person during the arrest had relevance to the amount of force the constables could reasonably employ.

While the court purported to admit the knife in evidence as a "similar" knife, the transcript reveals that it was by no means made clear to the jury that the knife as admitted had absolutely no connection with the knife alleged to be in Carson's posses-

sion except that it was a look-alike. The careful review of the transcript is important on this point. Assistant Chief Deputy Thomas is testifying:

Q. Officer Thomas, I will show you what has been marked as Defendants' Exhibit Number 2, and I will ask you if you have ever seen that knife before?

A. Yes.

Q. Tell the members of the Jury, if you would, where you have seen that knife.

A. It was protruding through the right pants leg of Arthur Wayne Carson.

Q. You say the right pants leg?

A. Yes.

Q. Now, what happened to that knife, if you know, Officer Thomas, after it was taken off of Mr. Carson's person on February the 10th?

A. It was given to me.

Q. And what, if anything, did you do with that?

A. I put it in the property room.

Q. Now, when you say "property room" explain to the Jury exactly what you mean by that.

A. This is a room that we—it's a locked room. There's only my boss and one secretary has a key to this. It's a room where we store weapons. No one else has access except those two.

Q. Do you put all of a prisoner's personal property into that particular property room?

A. No.

Q. If you would, explain if there's a difference in your putting some there and taking some somewhere else; what that procedure is.

A. In the normal case this knife would have been taken to the County Jail and placed with his property at the book-in section. But on this particular instance there was another charge of burglary of a vehicle that was filed, and this would be used in evidence. Had Mr. Carson been re-leased on bond, the knife would have gone with him and we wouldn't have had it for evidence if we had a case of burglary of a vehicle. And that was the reason it was retained in our office.

Q. Was it retained as physical evidence in a case, as opposed to just the suspect's personal property that would be later released to him?

A. That's correct.

After the defendants offered the knife in evidence, Carson's attorney, Mr. Cunningham, took Officer Thomas on voir dire:

Q. Mr. Thomas, are you saying that you can identify Plaintiff's Exhibit Number 2 as being the knife, you recognize this knife, or you just recognize it because Ms. Lagarde (defendants' attorney) showed you a knife that came out of that folder up there?

A. No, sir.

Q. You cannot identify this—

A. Yes, I can.

Q. You can tell this knife from another Old Timer?

A. I remember it being brown and white, and the trade name or brand name was Old Timer.

Q. Can you identify this as the knife taken from the—from Arthur Wayne Carson that day?

A. It was that type knife.

Q. Is that all you're able to say, it was this type knife?

A. That's the knife.

Q. Okay. Can you say it was this knife? If I showed you another Old Timer you could tell me it was this knife as opposed to another Old Timer?

A. If that's the knife that was here on the other hearing.

Q. That's the only way—

A. Yes, sir.

Q. —isn't it, Mr. Thomas?

MR. CUNNINGHAM: Your Honor, we'll object to the introduction of Defendants' Exhibit 2 if he can't identify it. There's no chain of custody been established.

THE COURT: Well, I'll admit it for the purpose of showing that it was a similar knife.

MR. CUNNINGHAM: Well, Your Honor, for the record, we'll object to the introduction of a similar type knife because it's irrelevant.

THE COURT: I'll overrule.

Later, the defendants undertook to introduce in evidence an envelope in which the knife purportedly had been kept. The transcript reads:

Q. I'll show you what has been marked for purposes of identification as Defendants' Exhibit 3, and ask you if you recognize that document?

A. Yes, I do.

Q. And what is that, please?

A. It's a package that I put the knife in before it was placed in the property room.

Q. And where have you seen that before?

A. At the other hearing.

Q. Did you see it on February the 10th of 1978?

A. Yes.

Q. Did you have occasion to prepare that yourself or have someone under your supervision prepare that?

A. Had a secretary, Coleen Reed, type it up.

Q. After that was typed up what was done with that?

A. She placed it in our secure property room.

Q. Was there any other item placed in this envelope before it was placed in the property room?

A. No.

Q. What about the knife?

A. Just the knife, is all that was placed in it.

Q. And did it remain there?

MR. LOEWINSOHN (plaintiff's co-counsel): I'm sorry, I can't hear back here. Excuse me.

THE COURT: Yes. He said just the knife was placed in it.

. . . . .

Q. Mr. Thomas, after February 10th of 1978 did you have occasion at some point in time to bring Defendants' Exhibits Number 2 and 3 somewhere?

A. To the last hearing.

MS. LAGARDE: We would offer into evidence Defendants' Exhibit Number 3.

MR. CUNNINGHAM: We'll object to Defendants' Exhibit Number 3, Your Honor, insofar as it's hearsay, and it does not prove the facts reflected on the exhibit itself.

THE COURT: I'll overrule the objection. I'll admit 3.

Thus the envelope in which the knife, admitted solely as a "similar" knife, was purportedly kept was admitted in evidence. Counsel for Carson on cross-examination then asked Officer Thomas:

Q. Mr. Thomas, can you sit here and swear that the knife that sits before you is the knife that was placed in Defendants' Exhibit 3?

A. Yes.

Q. You can testify that just because Ms. Lagarde handed that to you. You couldn't tell that Old Timer from any Old Timer, could you?

A. If the knife's been in the Court's possession.

Q. Do you know where the knife's been?

A. It's been left with the Court.

Q. Do you know that of your own personal knowledge?

A. Yes.

Q. You do?

A. I was advised of that.

Q. Do you know that of your own personal knowledge?

THE COURT: No, he doesn't.

MR. CUNNINGHAM: Your Honor, on the basis of them still being unable to establish a chain of custody, we still object to Defendants' Exhibit Number 3, or the introduction of it.

THE COURT: I'll overrule the objection.

This record reveals a far greater authentication of the knife than should have been

the effect of the court's limited admission of the knife solely because it was "similar." After the knife was admitted as similar, Thomas was allowed to testify that it was "the knife" which had been in police custody in the exhibit 3 envelope throughout, and he was permitted on the basis solely of unattributed hearsay to authenticate the exhibit 3 envelope as having been in police custody throughout the entire alleged custodial period and as having contained the exhibit 2 knife.

Concededly, this knife could have been admitted in evidence as illustrative or demonstrative evidence. Trial court's have great discretion in this area. *Gaspard v. Diamond M Drilling Co.*, 593 F.2d 605, 607 (5th Cir. 1979); *Wright v. Redman Mobile Homes, Inc.*, 541 F.2d 1096, 1097 (5th Cir. 1976). Illustrative evidence is admitted solely to help the witness explain his or her testimony. Illustrative evidence has no probative force beyond that which is lent to it by the credibility of the witness whose testimony it is used to explain. 22 Wright & Graham, Fed.Prac. & Pro. § 5174 p. 134 (1978).

Because it is tangible, however, illustrative evidence tends to have a strong effect in bolstering the credibility of the witness who identifies the illustrative exhibit. In the words of one treatise,

> Real proof often has an enormous apparent probative value because the lay trier may lose sight of the fact that its connection to a party may depend upon the credibility of an authenticating witness. Particularly since such proof is often taken into the jury room it continues to "speak" long after the witnesses have departed. Even the most unbelievable statements tend to take on an air of verity when they are connected to a tangible object.

*See* 5 Weinstein & Burger, *Weinstein's Evidence*, ¶ 901(a)[01], p. 17 (1978).

But what is crucial in this case is the fact that the record shows that ultimately it was not made clear to the jury that the knife was admitted solely for illustrative purposes. After admission only as a "similar" knife, Thomas reiterated that it was "the knife" which had been in police custody. This testimony occurred in connection with the admission of the envelope in which the knife was alleged to have been kept. It gave far more strength to the knife as an exhibit than was proper under the limited admission. The court gave no further instruction to the jury than is found in the transcript above. While no further specific instruction was requested by Carson, the precise and specific objections to the admission of the knife in evidence and to the admission of the envelope were clear.

Further, the knife was one of the exhibits taken to the jury room. It rarely is error to have such illustrative evidence introduced in the jury room, but in general: "[J]ust as the testimony of witnesses is not sent to the jury room, so illustrative objects should be left behind when the jury retires to deliberate. This practice will reduce the likelihood that jurors will use the object as a source of original inference. Moreover, it will eliminate any incentive for counsel to use illustrative objects solely as a method of smuggling argument into the jury room." 22 Wright & Graham, Fed.Prac. & Pro. § 5174 p. 137; *see United States v. Cox*, 633 F.2d 871, 874 (9th Cir. 1980), *cert. denied*, 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981). Under these particular circumstances, sending the knife into the jury room was an additional strengthening of its force as an exhibit.

Under all these circumstances, we must conclude that the record reveals the district court was in error in admitting in evidence the knife under the ambiguous posture which resulted. Such error clearly was prejudicial in view of the bitterly disputed factual issue concerning the alleged possession of a knife by Carson and the role that the alleged possession would play in justifying the force which the police officers used against Carson in effecting the arrest. This prejudicial error also justifies remanding the case for a new trial.

### C. Jury Misconduct

During the jury's deliberations at the second trial, the foreman of the jury, D. Joe

Stoddard, sent a letter to Judge Hill. The letter reads as follows:

17 Feb., 1981
richardson Tx

Judge Hill
U. S. District Court
Dallas, Texas
Your Honor,

Sitting in your court has been a privilege and I have enjoyed it. Your compassion for the jury is evident and your definitions during the hearing have enlightened the jury and imparted a sense of dignity to the jury. The questions given to us were clear and the instructions and definitions provided an important tool for the jury to reach a common understanding. As I heard the case the question developed as to why this case was being heard. The plaintiff's attorneys presented almost no evidence. On the one issue upon which the defendants might have been vulnerable the plaintiff's "friendly" witnesses (wife and mother) failed to corroborate the plaintiff's claim. Mr. Carson claimed to have been struck 3 times in the eye with much force; however, the witnesses who observed his condition a few days later make no mention of a swollen eye. They are specific about a "busted" lip, but make no reference to an eye being swollen. The eye is specific, it is critical, it holds maximum concern in case of any injury yet goes unmentioned by both friendly witnesses and by the nurse.

Why was the case brought against the defendants? Who paid the plaintiff's fees? I suspect the fees were paid from a public indigent plaintiff's fund, and that the attorneys earned $50–$60 per hour. With 80 hours in court plus twice that in preparation they earned perhaps $15,000 on this case.

It appears to me that the plaintiff's counsel performed a disservice to the plaintiff by falsely leading him to believe he had a case.

It is obvious that the defendants were victimized, or at least some of them were, we are still deliberating.

If the case is made against the plaintiff as suggested then the above parties are victims, and the court is itself is a victim. I would be pleased to have a series of questions added at the end of the present questions to explore this area.

This jury might be adjourned and reconvened for completion of these arguments. This jury is better informed on this matter than any other jury is likely to be. I have discussed this matter with no one. I feel that I am able to objectively view these other matters.

Respectfully yours,
D. Joe Stoddard (signed)

The letter was delivered to the court on the morning of February 17, 1981. Later that afternoon, the jury delivered a verdict for all defendants. Immediately after the return of the verdict, Carson moved for a mistrial on ground that the letter revealed that Stoddard had disregarded the court's instructions to consider only the evidence in the case and not to speculate about extraneous matters. Carson also argued that the letter demonstrated prejudice against the plaintiff that precluded Stoddard from serving as an impartial juror. Finally, Carson raised the possibility that Stoddard had discussed these matters with the jury and thereby tainted the jury's deliberations. Carson requested an evidentiary hearing to question the jurors on this matter. The district court, after deciding not to hold an evidentiary hearing, overruled Carson's request for a mistrial. Carson now argues that the district court abused its discretion in so doing.

It is well settled that a district court has broad discretion in deciding whether to grant a new trial for juror misconduct, and also has discretion in the methods used to gather sufficient evidence to decide the issue. *Martinez v. Food City, Inc.,* 658 F.2d 369, 372 (5th Cir. 1981). *See also Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *Traver v. Meshriy,* 627 F.2d 934, 941 (9th Cir. 1980). When a litigant seeks to impeach a jury's verdict, evidence on the private thought processes of individual jurors will not be

received. Fed.R.Ev. 606(b). The subjective thoughts and emotions that may have influenced a juror's deliberations are shielded from inquiry. *Mattox v. United States, supra; United States v. D'Angelo,* 598 F.2d 1002 (5th Cir. 1979). Evidence of extraneous matters that may have reached the jury and affected its deliberations, however, may be offered. *See* 3 Weinstein & Burger, *Weinstein's Evidence,* ¶ 606[04], pp. 606–28 (1978); 11 Wright & Miller, Fed.Prac. & Pro. § 2810, pp. 71–72 (1973).

 Stoddard's letter, while a most out-of-the-ordinary event, reveals only Stoddard's internal mental processes. The letter is largely concerned with Stoddard's views of the evidence in the case. The additional musings in which Stoddard engaged bear on his reaction to his appraisal of Carson's case. Certainly, some of the views Stoddard expressed would not constitute proper matter for jury deliberation nor for a juror to rely upon in reaching a verdict. Nevertheless, they fall precisely into the category of "possible subjective prejudices or improper motives of individual jurors" which are beyond the scope of inquiry through a motion for a new trial for jury misconduct. *Martinez v. Food City, Inc.,* 658 F.2d at 373. As the district court specifically noted in its written order denying Carson's motion for new trial, Stoddard's letter reveals no evidence whatsoever of influence by extrinsic material improperly placed before the jury. The district court drew the proper distinction between the internal mental reflections of a juror, which cannot serve as the basis to impeach a

jury's verdict, and extrinsic influence upon the jury, which may. *See Martinez v. Food City, Inc.,* 658 F.2d at 374.[11]

 The refusal of courts to lift the veil that covers a juror's thought processes is grounded on sound policy. The Supreme Court articulated the rationale in *Mattox v. United States,* 146 U.S. at 149, 13 S.Ct. at 53. " 'Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because, being personal, it is not accessible to other testimony. It gives the secret thought of one the power to disturb the expressed conclusions of twelve.' " While jurors may reach a verdict because of secret beliefs that have little to do with the law or the facts, such matters are not the proper subject of inquiry after verdict. *United States v. D'Angelo,* 598 F.2d at 1005. We summed up in *D'Angelo* the ultimate consequence of permitting the impeachment of jury verdicts by examination of the jurors' hidden thoughts.

> If courts were permitted to retry such verdicts, the result would be that every jury verdict would either become the court's verdict or would be permitted to stand only by the court's leave. This would destroy the effectiveness of the jury process which substantial justice demands and the constitution guarantees.

598 F.2d at 1005.

In an appropriate case, a letter from a juror to the court may reveal such a magnitude of prejudice as to move the court to grant a new trial rather than suffer an

---

**11.** We embrace the district court's reasoning in rejecting the notion that Stoddard's letter reveals prejudicial jury misconduct:

> In summary the letter demonstrates nothing more than the thought process that Stoddard was going through in attempting to arrive at a verdict after hearing the evidence in this action. The fact that he developed an animosity toward Carson's claim at the conclusion of the trial cannot serve as a basis of prejudicial error. An adverse feeling toward a party's claim after hearing the evidence of a case is a natural reaction to be expected of a juror. Although Stoddard does attempt to speculate on the role of Carson's attorneys in this action his doing so is also a reflection of

> his thought processes and cannot be a basis for misconduct. Noteworthy is the fact that his speculation in this regard is not indicated to have been a basis for his earlier expressed conclusion that Carson's claims lacked substance because of insufficiency and inconsistencies of the evidence. Finally, Stoddard's conclusion that he could objectively view the matters he discusses in the letter indicates that he had arrived at these feelings only after considering the evidence presented at the trial; in other words, these feelings did not result from any pre-trial-disposition on his part for or against the plaintiff or his counsel.

obvious default of justice. *See King-Size Publications, Inc. v. American News Co.,* 194 F.Supp. 109 (D.N.J.1961), *cert. denied,* 368 U.S. 920, 82 S.Ct. 242, 7 L.Ed.2d 136 (1961) (post-verdict letter from a juror revealed such extreme prejudice that the court exercised its discretion to order a new trial). Stoddard's letter falls short of such an extremity. We affirm the trial court's decision not to grant a new trial based on juror misconduct.

#### D. Summary

We hold that evidentiary errors in the exclusion of the Sheriff Department's performance evaluation reports require a new trial. We also uphold Carson's claim that the admission of the knife under the ambiguous circumstances which developed was erroneous and requires a new trial. We reject Carson's argument that the letter written by the foreman of the jury during deliberations requires a new trial.

Having decided that a new trial must be held, however, does not determine which defendants should be retried. The performance evaluation reports relate only to two defendants, Ellis and Holley, and the evidence of the knife directly only to Flatt, Crow and Jack Thomas. But as in the first trial, the evidentiary error as to some of the defendants may have affected Carson's ability to present his case as to others. Thus, the new trial must adjudicate claims against those defendants who relied on the credibility of Ellis and Holley and the evidence of the knife as justification for their actions.

A new trial need not necessarily be ordered as to all defendants. As Carson argued in attempting to rescue part of his jury verdict in the first trial, the constitutional violations and pendent state claims alleged by Carson grew out of two separate series of events, those during the arrest and those at the jail. The performance evaluation reports that we hold were improperly excluded pertain only to deputy sheriffs who participated in the jail house events. The knife pertained only to the original arrest. We cannot determine from the rec-

ord whether only the claims against the named officers need be retried. Accordingly, we remand this case to the district court to determine whether all defendants in the second trial must appear for a third trial, or whether only the five officers named above should be the subject of the third trial, together with Sheriff Carl Thomas as set out below.

#### IV. Claims Against Sheriff Carl Thomas

Carson makes two interrelated arguments that the district court erred in refusing to allow Carson to amend his complaint to include a claim of negligent hiring and supervision against Sheriff Carl Thomas. Carson sought to add this claim both before the first trial and in between the first and the second trials. Carson also argues that all claims against Sheriff Thomas, including the claims on which the jury exonerated him in the first trial, should be retried as a sanction for Thomas' tardy compliance with discovery requests. To address Carson's arguments, we must retrace the complex procedural background against which the arguments are made.

After the district court appointed counsel for Carson, two amended complaints were filed, on November 28, 1979, and December 31, 1979. One month before trial, on April 30, 1980, counsel for Carson sought leave to file a third amended complaint. That complaint differed from the earlier drafts only in alleging a claim against Sheriff Thomas for negligence in investigating, hiring, and employing the defendant deputy sheriffs. The district court denied leave to file the third amended complaint.

On the eve of the first trial, the only claims stated against Sheriff Thomas and Constable Vines were conspiracy claims and vicarious liability claims. At the close of evidence at the first trial, the district court directed a verdict against Carson on all conspiracy claims arising under both state and federal law. The district court allowed the state-law vicarious liability claims against Thomas and Vines to go to the jury. The jury rendered a verdict on those claims in favor of Vines and Thomas. When the district court granted the defendants' mo-

tion for a new trial, the court explicitly stated that "the liability of Carl Thomas and T. A. Vines will not be retried." The court also excluded from retrial all conspiracy issues.

Before the second trial, the plaintiffs moved to sever the claims against Sheriff Thomas and Constable Vines and to have judgment entered in favor of these two defendants. Presumably, this motion was made to expedite an appeal of such a judgment. The court denied this motion, however. Shortly thereafter, the court granted leave to Carson to file a third amended complaint. The third amended complaint realleged all of the causes of action with which Carson had originally charged Thomas. In addition, the amended complaint alleged the negligent hiring and supervision claim that the district court had rejected in denying leave to file a third amended complaint before the first trial. In response to this complaint, Sheriff Thomas moved to dismiss all allegations against him. The court granted the motion, citing both its earlier decision not to retry the claims against Sheriff Thomas and its earlier refusal to allow Carson to add a negligent hiring and supervision claim against Thomas before the first trial. The court reasoned that Carson had had access to the facts needed to state a claim against Thomas based on negligent supervision when he filed the second amended complaint. Because he had failed to allege that cause of action in a timely fashion before the first trial, the district court refused to allow him to add it in the proffered third complaint before the first trial and also in the amended complaint before the second trial.

Carson made one more attempt to include Sheriff Thomas in the second trial. Carson sought to bring Sheriff Thomas back into this case as a sanction for Thomas' late response to discovery requests. More than one year before the first trial, Sheriff Thomas was requested to produce all records in the sheriff's department files on Carson. Some significant documents, however, were not produced until the day that the *second trial* began. The documents included the arrest reports on Carson and two

photographs of Carson that were taken during the book-in process and which revealed the extent of Carson's injuries. The district court refused the request to reinstate all claims against Thomas as a sanction for his failure to comply with Carson's discovery requests.

Carson argues on appeal that the district court erred in three respects. First, Carson maintains that the district court should have granted leave to amend to allow Carson to allege negligent supervision and hiring against Thomas before the first trial. Second, Carson argues that the district court erred in striking the negligent hiring and supervision claims against Thomas from the third amended complaint before the second trial. Third, Carson argues that the district court should have granted reinstatement of Sheriff Thomas as a defendant on all claims raised against him because of Thomas' failure to comply with Carson's discovery requests.

■■■ We conclude that the district court abused its discretion in denying Carson leave to amend his complaint before the first trial. Federal Rule of Civil Procedure 15(a) governs the amendment of pleadings. That rule allows a party to amend his pleading only once as a matter of course; however, it also provides that "[o]therwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and *leave shall be freely given when justice so requires.*" (emphasis added). A district court thus has discretionary power to grant leave to amend a complaint, and our power to reverse a district court's decision to deny leave is limited to cases in which the district court has abused its discretion. *Daly v. Sprague,* 675 F.2d 716, 722–23 (5th Cir. 1982); *Daves v. Payless Cashways, Inc.,* 661 F.2d 1022, 1025 (5th Cir. 1981); *Bamm, Inc. v. GAF Corp.,* 651 F.2d 389, 391 (5th Cir. 1981). We review a district court's denial of leave to amend in light of the policy embodied of the federal rules freely to permit amendments to complaints. As we noted in *Dussouy v. Gulf Coast Investment Corp.,* 660 F.2d 594, 598

(5th Cir. 1981), Rule 15 "evinces a bias in favor of granting leave to amend.... Thus, unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial."

The Supreme Court in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), enumerated some of the reasons that might justify a district court's refusal to allow amendment. These reasons include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc." We have uniformly applied this standard in reviewing district court decisions denying leave to amend. *See, e.g., Daves v. Payless Cashways, Inc.*, 661 F.2d at 1024; *Bamm, Inc. v. GAF Corp.*, 651 F.2d at 391; *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d at 598.

The district court here gave only one reason for denying Carson leave to amend his complaint. According to its order striking Carson's allegations against Sheriff Thomas before the second trial, the district court was of the view that when Carson filed the second amended complaint before the first trial, he knew enough facts to have alleged the claim against Thomas. The delay in making the allegation until one month before the first trial, therefore, was unjustified. The district court apparently viewed Carson as having repeatedly failed "to cure deficiencies by amendments previously allowed." *Foman v. Davis*, 371 U.S. at 182, 83 S.Ct. at 230.

We find the district court's reasoning unsupported by the record. There is no evidence that Carson could have adequately framed his negligent supervision and hiring claim against Sheriff Thomas when the second amended complaint was filed. In his brief in support of his motion to amend his complaint, Carson alleged that he had discovered new facts in between the filing of the second amended complaint and the proposed third amended complaint. These facts pertained to the performance on duty of three deputy sheriffs. Carson was allowed to inspect performance evaluation reports on the deputy sheriffs and make notes on the reports in late January 1980, after the second amended complaint was filed. But the defendants refused to allow Carson to copy the reports. In April 1980, Carson filed a motion to compel the defendants to allow him to copy the reports. This motion was eventually denied, although Carson was granted the privilege of examining the documents further. The reports concerned the knowledge available to Sheriff Thomas about the behavior of his employees, and, therefore, directly related to the theory of negligent hiring and supervision that Carson sought to allege against Sheriff Thomas. This information, therefore, was obtained after the second amended complaint had been filed.

 A litigant's failure to assert a claim as soon as he could have is properly a factor to be considered in deciding whether to grant leave to amend. Merely because a claim was not presented as promptly as possible, however, does not vest the district court with authority to punish the litigant. Here, all other considerations pointed towards allowing Carson to assert his additional claim against Sheriff Thomas. No pretrial order had been entered in the case, nor had a pretrial conference been held. There is no evidence in the record to suggest that Carson acted in bad faith in not including the negligent hiring and supervision claim from the first two amended complaints. Nor is there evidence of prejudice to the defendants if the claim was allowed to be made. We see no justification on these facts for denying Carson leave to add the negligent hiring and supervision claim.

Decisions in which we have upheld denial of leave to amend present far more flagrant examples of delay, disruption of the litigation, or prejudice. For example, in *Daly v. Sprague, supra,* we held that the district court did not abuse its discretion in denying the plaintiff leave to amend his complaint when the proposed amendment was tendered sixteen months after the original

complaint, and only two weeks before trial. The plaintiff had allowed the case to languish in inactivity for nearly a year between the filing of the complaint and the eventual setting of the trial date. 675 F.2d at 720. Carson's attorneys were appointed after a pro se beginning and had been on the case only about four months when the second amended complaint was filed. Nothing in their actions approaches this level of disregard for the progress of a case.

In *Daves v. Payless Cashways, Inc.,* supra, the plaintiff sought to amend her complaint on the day of trial, more than a year and a half after the complaint had been filed and after discovery had been completed. We held that the unexplained delay in seeking to amend the complaint, coupled with the fact that the amended complaint presented a theory of recovery far removed from the original, justified the denial of leave to amend even though there was no showing of bad faith.

 District courts are entitled to manage their cases with the aim of conducting litigation efficiently. The goal of efficient litigation, however, was not furthered by the denial of leave to amend in this case. The theory of negligent hiring and supervision represented "an alternative theory for recovery". *Foman v. Davis,* 371 U.S. at 182, 83 S.Ct. at 230. Trial of this issue would have worked no serious prejudice on the sheriff who was already a defendant. While there must come a point where a district court can curtail the presentation of multiple "theories seriatim," *Gregory v. Mitchell,* 634 F.2d 199, 203 (5th Cir. 1981), that point was not reached here. We hold that the district court abused its discretion in denying the amendment of the complaint to state a claim of negligent hiring and supervision against Sheriff Thomas.[12] Because we so hold, it follows that the district

court should have allowed the claims of negligent hiring and supervision to stand in the third amended complaint filed between the first and second trials.

 Carson also argues that the district court abused its discretion in declining to reinstate all claims made against Sheriff Carl Thomas as a sanction for his failure to comply with requests for production of documents until the day of the second trial.[13] This wholly novel concept of a proper sanction for failure to obey discovery orders has no foundation in the law, and we reject it. Reduced to its elements this is a claim that a person who should not be a party to a lawsuit nevertheless should be made a party wholly as a sanction for failing to obey a discovery order. Stated in those terms, the theory falls of its own weight.

We have held that when a party to a case withholds from discovery evidence of importance to the fair disposition of the case, we can set aside a jury verdict and a judgment based upon it. *Rozier v. Ford Motor Co.,* 573 F.2d 1332 (5th Cir. 1978); *Jones v. Western Geophysical Co.,* 669 F.2d 280 (5th Cir. 1982). But the bald assertion by Carson in this case is that regardless of whether the evidence subject to the discovery attempts would have any significant impact in the case, Sheriff Thomas should be made a party and tried just because of his alleged failure adequately to allow discovery. To impose this kind of sanction would be a gross misuse of the judicial process. The documents made the subject of the discovery motion had some relevance to the case. But in the sanction analysis urged by Carson, it must be shown that those documents were vital to the case and prejudiced him. The issue then becomes not one of sanction but the right to a new trial for failure to supply relevant evidence upon discovery. *Rozier v. Ford Motor Co., supra,* 573 F.2d at 1349.

12. We do not decide whether Carson has stated a cause of action under this theory of recovery. Nor do we decide whether the district court should invoke its pendent jurisdiction to hear this state law claim against Sheriff Thomas. These issues may be raised and resolved by the district court in the first instance.

13. The documents in question included two photographs of Carson taken during the book-in process, arrest reports on Arthur Carson, sheriff's department booking offense forms on Carson, and a miscellaneous crime report dealing with the alleged car theft committed by Carson.

It appears that the failure to produce the documents earlier in this case resulted more from confusion in the record-keeping methods of the Dallas County Jail and the Constable's Office than it did from willful flouting of requests for production. Many documents were tendered in response to the request for production, and no court order had been entered against the defendants requiring further production. Under Fed.R.Civ.P., Rule 60(b)(3), a new trial should be granted only if the "conduct complained of [was] such as prevented the losing party from fully and fairly presenting his case or defense." Here the documents withheld by the Sheriff's Department fall far short of this standard. No possibility of substantial prejudice is shown. We deny the assertion that all claims against Sheriff Thomas should be retried as a sanction.

## V. Carson's Request to Appeal In Forma Pauperis

Carson moved the district court for permission to bring this appeal in forma pauperis and to require the United States Government to bear the costs of printing the record on appeal. 28 U.S.C. § 1915(a) authorizes a court to allow an appeal of any suit, civil or criminal, "without prepayment of fees and costs for security therefor, by a person who makes affidavit that he is unable to pay such costs or security therefor." 28 U.S.C. § 1915(b) authorizes a court to "direct payment of the expenses of (1) printing the record on appeal in any civil or criminal case when such printing is required by the appellate court. . . ." Carson made a proper affidavit of his inability to bear the costs of the appeal or the printing of the record. The district court denied Carson's motions because "the Court is of the opinion that none of the . . . alleged errors are meritorious and that an appeal of this action, therefore, is not in good faith."

The district court exercises discretion in denying leave to proceed in forma pauperis. *Williams v. Estelle,* 681 F.2d 946, 947, slip op. at 3853 (5th Cir. 1982); *Green*

*v. Estelle,* 649 F.2d 298, 302 (5th Cir. 1981). We must conclude, however, that the district court abused its discretion in this case. Our difficult deliberations in resolving the issues presented on appeal provides strong indication that the appeal was not frivolous. Having made the proper economic showing and having raised issues on appeal that were not frivolous, Carson was entitled to proceed in forma pauperis.

## VI. Defendants' Cross Appeal

As its sanction for the defendants' late tender of documents,[14] the district court ordered the defendants Jack Thomas, Crow, Flatt, Ellis, Holley, Polley, and Ingram to pay attorneys' fees and costs to Carson's appointed counsel. These fees and costs totalled $3,899.70. The court stated that it was "unable to determine specifically which defendants were guilty of which acts of misconduct, so the sanctions are addressed against all of the defendants." The defendants attack this award of sanctions on three separate grounds.

First, the defendants argue that there was no basis to impose sanctions because Carson's discovery request was in fact satisfied, albeit not until the eve of the second trial. We reject this argument. As we discussed above, the district court has discretion to impose appropriate sanctions against noncompliance with discovery requests. What we determined above is that forcing someone to be a party to the case is not a proper sanction. The authority of the district court to sanction failure to comply with discovery requirements was properly exercised by its order.

Second, defendants argue that the absence of specific fact findings by the trial court dictates that we reverse its imposition of sanctions. The defendants cite no authority for the proposition that we must reverse a trial court's decision to impose sanctions unless the trial court supports its decision by written findings of fact and conclusions of law. When findings are not

---

**14.** This is the late tender which we described above in reviewing Carson's contention that all claims against Sheriff Thomas should be reinstated as a sanction.

specifically required by the Federal Rules or a decision of this Court, we will not reverse an otherwise justified action by the trial court simply because the court did not take time to explain in detail the basis of its decision.

Finally, the defendants argue that the trial court committed error by failing to specify the precise amount of the sanction that should be borne by each defendant. Nothing in the record suggests that counsel for the defendants approached the district court for guidance on this point. The order appears to render each defendant jointly and severally liable for the entire amount of the discovery noncompliance sanction. We leave it to the defendants to decide how to apportion this sanction, without prejudice to the defendants' right to approach the district court for clarification.

We reject defendants' objections to the sanctions as without merit.

### VII. Conclusion

We hold that the district court did not abuse its discretion in ordering a new trial in this case after the first trial. We also hold, however, that errors in the second trial compel that the case be remanded for another trial. The district court must determine the precise scope of that trial on remand of this case in accordance with this opinion. In addition, we hold that the district court did abuse its discretion in declining to allow Carson to amend his complaint to state a cause of action against Sheriff Thomas in negligence in the hiring and supervision of his officers. That claim must be adjudicated upon remand. We decline to disturb the district court's imposition of sanctions on the defendants for failure to meet timely discovery requirements. Finally, Carson must be permitted to proceed in forma pauperis on this appeal. Accordingly, this case is

AFFIRMED in part, REVERSED in part, and REMANDED.