Robert J. BOLTON, et al.,
Plaintiffs–Appellants,

v.

TESORO PETROLEUM CORP., et al.,
Defendants–Appellees.

Robert J. BOLTON, etc., et al.,
Plaintiffs–Appellants,

v.

Robert V. WEST, et al.,
Defendants–Appellees.

Nos. 87–5617, 88–5512 and 88–5534.

United States Court of Appeals,
Fifth Circuit.

April 24, 1989.

---

Paul R. Rosen (argued), Daniel J. Dugan, Philadelphia, Pa., Joel H. Pullen, Michele Petty, San Antonio, Tex., for Bolten, et al.

Steven B. Rosenfeld (argued), Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Michael M. Wilson, B. Daryl Bristow, Richard B. Miller, Miller, Keeton, Bristow & Brown, Suzanne B. Baker, Houston, Tex., William Hall, Jr., Tesoro Petroleum Corp., Roy Barrera, Nicholas & Barrera, R. Laurence Macon, Cox & Smith, San Antonio, Tex., for Tesoro, et al.

A.W. Worthy, Gresham, Davis, Gregory Worthy & Moore, San Antonio, Tex., for Frost.

Roger L. Waldman, Charles Fournier, Webster & Sheffield, New York City, for Detwiler.

Barry Fertel, Bell Kalnick Beckman Klee & Green, New York City, for Spitzer.

John J. Sheehy, Rogers & Wells, New York City, for Richard E. Deems.

Robert Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, Tex., for McKetta.

John E. Clark, Thomas Thurmond, Thurmond & Thurman, John E. Clark, Sawtelle, Goode, Davidson & Troolo, San Antonio, Tex., for Tesoro.

Before GEE, REAVLEY and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

After more than five months of trial, including nearly three weeks of deliberations, a jury returned a defense verdict on all claims in this combined class action and derivative suit brought by disgruntled investors in Tesoro Petroleum Corporation. Appellants, asserting a variety of arguments, seek a second trial. We reject the request, affirming on all substantive issues, modifying only the district court's award of costs.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The record comes to us in eighteen boxes, including a 156 volume trial transcript.

The relevant events, however, sort to three factual contexts, broadly stated.

### A. *Foreign Payments and the Grand Jury Investigation*

Before the Foreign Corrupt Practices Act of 1977,[1] Tesoro Petroleum Corporation made "sensitive payments" designed to influence officials of foreign governments on matters of interest to the company. Tesoro's payments to foreign officials first came to light during an Internal Revenue Service investigation. The Securities and Exchange Commission also began an investigation, and Tesoro elected to participate in the SEC's "voluntary disclosure" program. In 1977, Tesoro's Board of Directors created a special committee of independent, outside directors responsible for investigating the sensitive payments, recommending actions to be taken, and reporting to the SEC. The committee hired two Houston law firms as counsel, Fulbright & Jaworski and Vinson & Elkins, and the Fulbright firm conducted an extensive investigation concluded by its final report. The report discussed evidence of payments to officials or other questionable activities in six foreign countries. Acting on legal advice, the special committee disclosed certain payments in a Form 8–K filed with the SEC. The SEC then began a formal investigation, ending with a consent judgment requiring Tesoro to file a supplemental Form 8–K and enjoining future violations. The SEC referred the sensitive payments matter to the Justice Department, and a grand jury began an investigation in 1978. The grand jury also investigated whether Tesoro or any of its officers had defrauded the government or obstructed justice in connection with the various investigations.[2]

In 1981, Tesoro's Board of Directors created another special committee, composed of four independent, outside directors. That committee hired Kirkland & Ellis as independent counsel and set about to discharge its responsibility to monitor the grand jury investigation and make any required disclosures. Tesoro had disclosed the pendency of the grand jury investigation when it began. In a January 25, 1982 proxy statement, the 1981 Special Committee, after referring to the Fulbright & Jaworski investigation, SEC investigation, and the Forms 8–K describing the investigations, disclosed the following:

> A Federal Grand Jury sitting in Washington D.C. is currently conducting an inquiry into certain aspects of the matters involved in the Special Committee's and the SEC's investigations. The Grand Jury inquiry is continuing, and the Company is unable to predict at this time what the effect of such investigation, or the findings resulting therefrom, will be. The Company is cooperating fully in an effort to expedite the disposition of this matter.
>
> Dr. West participated in, or had knowledge of, most of the transactions covered by the Special Committee's and the SEC's investigations. Certain other members of the Board of Directors participated in, or had knowledge of, to varying degrees, some of such transactions.

The grand jury ended its investigation in 1984 without returning any indictments.

### B. *The Diamond Shamrock Approach*

In August 1980, Diamond Shamrock Corporation informed Tesoro that it had acquired 4.5 percent of Tesoro's common stock. On August 20, an informal telephonic conference was held for all available Tesoro directors. After hearing advice from attorneys and financial advisors, the Board members unanimously resolved that Tesoro was not for sale and that they would resist offers not deemed to be in the shareholders' best interests. Tesoro communicated its position to Diamond Shamrock that same day.

On August 21, Diamond Shamrock's Board of Directors authorized its Chairman to initiate a tender offer for Tesoro common stock not to exceed $38 per share. A week later, Diamond Shamrock informed Tesoro that it had abandoned plans to ac-

---

**1.** *See* 15 U.S.C. §§ 78dd–1, 78dd–2.

**2.** The grand jury investigation is discussed in *In re Sealed Case,* 676 F.2d 793 (D.C.Cir.1982).

quire more Tesoro stock. In the interim, Tesoro had sued Diamond Shamrock to block the takeover and the government of Trinidad and Tobago, majority partner in a Tesoro–Trinidad joint venture, announced its opposition to any acquisition of the company. The parties agree that this announcement caused Diamond Shamrock to lose interest in the takeover attempt. Appellants asserted at trial that the acts of the Trinidadian government were prompted by Tesoro.

### C. *Reorganization Plans*

During the Diamond Shamrock episode, speculation carried Tesoro's stock up over $32 per share, but at its end prices dropped, at times falling below half of the previous highs. Tesoro considered reorganization. Lazard Freres & Co. developed the first plan for reorganization, describing it in a January 11, 1982 memorandum. The Lazard Freres plan envisioned that a public company would be spun off to shareholders, its assets consisting primarily of Tesoro's oilfield service businesses. Refinery and marketing assets would be sold for cash to a new private company owned by Lazard, outside investors, and Tesoro's management. Other assets would be liquidated.

In early January, trading in Tesoro stock increased, apparently responding to rumors of a reorganization. On January 25, the same day the proxy statement disclosed the grand jury matter, Tesoro issued the following press release:

In response to the recent market activity in its stock, Tesoro Petroleum Corporation announced today that its management and investment bankers are considering several courses of action to alleviate the undervaluation of the company's stock in the market. Among the steps being considered are the distribution of certain of the company's operations to its shareholders and the sale of other company operations for cash which would be distributed to the shareholders. The announcement emphasized that there is no assurance that any of the actions being studied will be adopted by the company.

At that time, the Lazard Plan had not been presented to the entire Board of Directors.

The Board was informed about the Lazard Plan at its January 27 meeting. Since certain directors would potentially be investors in the new private company, the Board created another special committee of independent, outside directors, identical in membership to the committee reviewing grand jury disclosures. The committee was asked to review the Lazard Plan for fairness to shareholders and to consider other alternatives to increase the value of Tesoro stock. The parties differ over how close the Lazard Plan was to implementation at this point. Appellants point out that Lazard Freres had already found a lender interested in leading a syndicate of banks to finance the plan, as well as certain investors willing to purchase preferred stock in the private company. Appellees argue that financing for the private company was still contingent, and that the Lazard Plan faced other contingencies such as obtaining Board and shareholder approval and finding purchasers for Tesoro assets.

By mid-May, Tesoro decided not to pursue the Lazard Plan further. The parties dispute why. Appellants emphasize testimony that implementing the Lazard Plan would have required the company to make additional disclosures about the grand jury investigation. However, the same witness also identified three other "bullets" which made the plan unfeasible, including a contingent tax liability, claims asserted by the Department of Energy based on alleged overcharges for regulated oil, and a California Public Utility Commission order threatening the abrogation of a profitable contract between Tesoro's Alaskan refinery and San Diego Gas & Electric Company. Two other members of the 1982 Special Committee testified that deterioration in the oil and gas industry contributed to the decision. Appellees emphasize that Lazard Freres determined independently to withdraw the Lazard Plan, and allegedly communicated this decision to Tesoro's CEO before the 1982 Special Committee made its report. Appellants believe that the leveraged buy out plan was stalled only temporarily, pointing to handwritten notes taken

at a meeting which described the "going private part of plan" as "dead for [the] time being."

After the demise of the Lazard Plan, Tesoro quickly developed an alternative plan of reorganization. The new plan called for splitting Tesoro into two public companies, one running the oilfield services business, and the other operating the refining business. While this scheme resembled the Lazard Plan in some respects, it did not require the financing of a leveraged buy out. The two public companies plan was presented to the Board of Directors on May 26, 1982, and described in a press release the next day. But appellants saw this alternative plan as a sham designed to mask Tesoro's true intention, to repurchase Tesoro stock as the first step of a scheme to take the company private.

Tesoro eventually abandoned the two public companies plan and, on July 28, 1982, announced a "self-tender offer" for its own stock at $22 per share, substantially above the going market rate. Three investment banking firms gave opinions that the $22 price was fair to all Tesoro shareholders, and the tender offer was oversubscribed. But appellants saw the offer as a Tesoro effort to reduce outstanding shares and eliminate dissident shareholders to facilitate a later leveraged buy out. Appellees assert that the problems in the oil and gas industry made any restructuring of Tesoro unfeasible, and that the stock repurchase was not considered at all until early July.

### D. *Claims Asserted*

This appeal involves two separate lawsuits which were consolidated for trial. The class action was filed on October 1, 1982, soon after Tesoro's stock repurchase. The named class plaintiffs were Robert J. Bolton, George E. Meyer and Leo A. Walker, III. Mr. Meyer voluntarily withdrew as a named plaintiff a few months after suit was filed, though he remained a class member. The derivative action was filed by Bolton on October 7, 1982. Defendants in the two actions included Tesoro Petroleum

and various individuals associated with the relevant events. Lazard Freres and one of its partners settled before trial, while two outside directors were voluntarily dismissed by the plaintiffs.

### 1. Class Action Claims

The district court certified four classes of investors:

1) The "Buyer Class" included all purchasers of Tesoro common or preferred stock from January 25, 1982 (date of grand jury disclosure) until suspension of trading in Tesoro stock on May 27, 1982 (press release announcing consideration of two public companies plan).

2) The "Seller Class" included all sellers of Tesoro common or preferred stock from after the suspension of trading on May 27, 1982 through September 30, 1982 (filing of lawsuit).

3) The "Proxy Class" included all record shareholders as of January 14, 1982 who were entitled to receive the January 25 proxy statement in connection with management's solicitation of proxies for the February 24, 1982 shareholder meeting.

4) The "Tender Class" included all who tendered shares of common stock or converted shares of convertible preferred stock pursuant to the July 1982 tender offer.

There were two damage claims based on alleged violations of SEC Rule 10b–5.[3] First, the Buyer Class asserted injury from the allegedly inflated market price of Tesoro common stock and call options caused by material misrepresentations and omissions from January 25, 1982 to May 27, 1982. Second, the Seller and Tender Classes claimed injury from an alleged deflation of Tesoro's stock between May 27, 1982 and September 30, 1982, caused by the May 27 press release that misled investors regarding the defendants' true intentions.

The plaintiffs also asserted claims premised on the Racketeer Influenced and Cor-

---

**3.** 17 C.F.R. § 240.10b–5.

rupt Organizations Act,[4] alleging that the defendants conspired to conduct and maintain control of Tesoro through a pattern of racketeering activity. The Rule 10b–5 claims, state law commercial bribery, obstruction of justice, and wire and mail fraud were its predicate acts. RICO damages were premised on the alleged Rule 10b–5 violations and on an asserted loss of the "value of control" of Tesoro. Plaintiffs also requested equitable relief for the Proxy Class, including removal of certain directors, based on alleged violations of SEC Rule 14a–9,[5] and SEC Regulation S–K.[6]

### 2. Derivative Claim

Plaintiff Bolton asserted a derivative claim on behalf of Tesoro. He sought indemnification from responsible defendants for any liability of Tesoro in the class action. He also asserted injury to Tesoro based on the defendants' hostile reaction to the Diamond Shamrock takeover approach.

## II. ARGUMENTS ON APPEAL

### A. *Jury Instructions*

### 1. Materiality

Appellants object to the district court's instructions on the "materiality" of facts allegedly misrepresented or omitted for purposes of the claims under Rule 10b–5. The court's materiality instructions included the following paragraph:

> Preliminary negotiations or plans concerning mergers, reorganizations or other significant corporate transactions like a stock buy-back are not considered "material" facts requiring disclosures to the investing public unless and until there is a proposal or an agreement incorporating the fundamental terms of the transaction, such as price and structure. So

long as discussions regarding such developments are preliminary, tentative, or contingent in nature, such information is not "material" as a matter of law and there is no duty to disclose it.

Appellants' present attack upon this instruction rests on *Basic, Inc. v. Levinson*,[7] decided after trial in this case. The Court concluded in *Basic* that an omitted fact is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[8] The district court included much of the *Basic* language in its instruction on "materiality." However, the *Basic* Court rejected and the district court here insisted upon an "agreement-in-principle" test for determining the materiality of preliminary plans or negotiations.[9] Appellants argue that the charge thus trips on its explanation of the materiality of preliminary plans or negotiations.

■ A "formal objection is not necessary if the trial judge was fairly apprised of the nature of the objection."[10] Appellants objected to the instructions "to the extent any charge [they] requested was not given by the Court." This is little more than a nod to Rule 51; it is not sufficient to inform the trial court of a perceived problem. Appellants also suggest that they objected to the materiality instructions in a conference with the district court's law clerk. Such communication with a law clerk may assist the court in its preparation of the charge. It is not a legally sufficient objection. Moreover, this "conference" with the law clerk was not included in the record on appeal. In sum, we find no adequate objection and without an objection, we will listen only to plain error.

---

**4.** Plaintiffs' asserted claims based on 18 U.S.C. § 1962(b)-(d).

**5.** 17 C.F.R. § 240.14a–9.

**6.** 17 C.F.R. §§ 229.402, 229.404.

**7.** 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

**8.** *Id.* 108 S.Ct. at 983 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

**9.** *Id.* 108 S.Ct. at 986.

**10.** *Bass v. United States Department of Agriculture*, 737 F.2d 1408, 1413 (5th Cir.1984) (citing *Williams v. Hennessey*, 328 F.2d 490, 491 (5th Cir.1964)).

■ As we will explain, we are persuaded that any error in the instruction challenged was likely harmless, but in any event was not the cause of injustice. The argument is that the charge's insistence that merger or reorganization plans did not become material until there was an agreement to the fundamental terms of the scheme prejudiced the claim that defendants wrongfully failed to disclose the "plan to go private through an LBO"; that the company's tender offer was a part of the "undisclosed plan to go private," that the plan existed in May of 1982, and that the district court's instruction prevented the jury from considering whether information regarding the tender offer should have been disclosed earlier.

Despite its surface appeal the argument is deeply flawed. First, any error in the definition of materiality, specifically its insistence on an agreement in principle, had no bearing on the Buyer Class. This class asserted non-disclosures regarding the grand jury investigation. Appellants now suggest, although it is unclear that they made the argument at trial, that insisting on an agreement as the litmus of materiality foreclosed their argument that defendants ought to have disclosed the Lazard Plan in January 1982. How such a failure could have injured the *Buyer* Class is not explained. We are not persuaded that the claims of the Buyer Class suffered from the error in the charge.

We also find no prejudice to the Seller Class and Tender Class claims under Rule 10b–5. By insisting on an agreement in principle as a trigger to any obligation to disclose, the charge erroneously narrowed defendants' obligation to make any disclosure. But this error was not of consequence here. The theory of damages suffered by the Seller and Tender Classes did not depend on a failure to disclose, but rather rested on the assertion that the May 27, 1982 press release, announcing consideration of a two public companies plan, was a sham, a ploy to drive down the price of Tesoro stock, so that the tender offer could

be made at less cost to the company.[11] Indeed, the damage proof rested on this theory. A damage expert based his damage estimates for the Seller and Tender Classes on a comparison of actual stock prices from May 27 through September 30, and the stock prices which might have occurred had the company made the tender offer on May 27. In sum, the claim of the Seller and Tender Classes was that defendants fraudulently misstated the plan, and the charge correctly submitted that theory.

Immediately after the challenged portion of the materiality instructions, the district court instructed the jury that "any disclosure of such plans, even if not required, must be complete and accurate." Thus, if the jury believed appellants' theory that the May 27 press release was a sham, then the company's disclosure would not be "complete and accurate," and the district court's instructions would compel a finding that the company's omissions were material.

Finally, and relatedly, the theories advanced at trial by the Seller and Tender Classes did not rest on a contention that material planning short of an agreement in principal was wrongfully not disclosed. Rather they urged that Tesoro did have a fully developed plan not disclosed by Tesoro as part of its objective to drive down the price of the stock before effectuating its plan. Thus, insisting on an agreement in principle, while contrary to *Basic*, imposed no additional burden on the Seller and Tender Classes.

We do not review the abstract correctness of a charge. Rather we ask whether in the context of trial the jury was fairly and accurately instructed. Inaccurate statements that prove in retrospect to have been demonstrably irrelevant are just that—irrelevant and inconsequential errors—not unusual attendants to long and hard fought trials. In context, the failure to fully anticipate *Basic* proves to be just such an irrelevancy.

---

**11.** Appellants' relevant contentions, as set forth in the Pretrial Order, are reproduced in Appendix A to this opinion.

### 2. Business Judgment Rule

The derivative plaintiff also challenges the district court's instructions regarding the business judgment rule under Delaware law. As we understand it, the argument is that the district court should have conditioned the jury's application of the business judgment rule on a prior finding that the directors fulfilled their fiduciary duties to the corporation. The focus is upon one sentence from *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,*[12] in which the Delaware Supreme Court stated that "[w]hile the business judgment rule may be applicable to the actions of corporate directors responding to takeover threats, the principles upon which it is founded—care, loyalty and independence—must first be satisfied." The argument continues that the instructions on the business judgment rule as a whole misled the jury into believing that the directors' resistance to the Diamond Shamrock takeover attempt was conclusively presumed to be valid. The contention at trial was that defendants failed to exercise due care, failed to act on an informed basis, and resisted the takeover out of a desire to maintain their positions at Tesoro and prevent the company from cooperating fully in the grand jury investigation.

■ We find no error in the district court's instructions. The court began with a complete description of the directors' fiduciary duties. It then emphasized the fiduciary duties in a takeover situation:

> Where a corporation is approached by a third party, whether such party is already a shareholder or not, and such party desires to acquire the outstanding shares of the corporation, the director's fiduciary duties to the shareholders apply fully in determining what course of action to take. When a board opposes a takeover threat or when it implements anti-takeover measures there is a potential for conflict between the interests of the board and management on the one hand [and] the shareholders on the other. Accordingly in such a situation the directors must at all times act in good

faith, on an informed basis and in the honest belief that their action is in the best interests of the company and its shareholders.

After describing the business judgment rule, the court instructed the jury that defendants could only rely on its protection if they first established that they "reasonably perceived a threat to the corporate policy and effectiveness of the company" from the takeover, and that the "response made was reasonable in relation to the threat they perceived." In discussing the first prong of this test, the court stated that the directors could "satisfy their burden on this issue by showing that they acted in good faith and after reasonable investigation." The judge further emphasized that "[t]here can be no self-dealing, nor can the directors in responding to a possible takeover act in bad faith, fraudulently, or to protect or further the interests of all or some of the directors." While instructing that the jury could only find the directors' decision uninformed if the directors were grossly negligent, the court also stated that "the methods and procedures they follow in gathering and analyzing information cannot be restricted in scope, shallow in execution, a mere pretext, half-hearted, or a sham."

These portions of the charge amply placed on the directors the burden of showing that they met their fiduciary duties before enjoying the protection of the business judgment rule. It is plain that the jury instructions did not establish a conclusive presumption in favor of the directors' acts. In short we are not persuaded that the district court misstated the responsibilities of directors under Delaware law in responding to a takeover threat.

### B. *Jury Tampering*

■ Appellants argue that the district court abused its discretion in its handling of their charges of jury tampering raised in their motion for new trial. It is true that one of the court security personnel assigned to the case, Finton Stewart, was

**12.** 506 A.2d 173, 180 (Del.1986).

convicted after offering to sell the appellants information that the jury had been compromised. Nonetheless, we find no abuse of discretion.

In response to questions by appellants' counsel during a transcribed interview given after Stewart's arrest, Stewart indicated that a juror had been seen several times speaking with one of the United States Marshals. Stewart had also been told that the two were observed together on one occasion outside the courthouse. Stewart did not know the substance of their conversations. Stewart also related an incident in which another of the jurors had complained about extraneous information in the jury room which had not been presented during trial. Though court security personnel are normally required to report such matters to the judge, no such report was made of this incident.

The district court interviewed each of the jury members *in camera*. Mindful of the limitations on juror testimony imposed by Fed.R. Evid. 606(b), the court carefully framed its questions to limit its inquiry into what extraneous information had been discussed by the jury and whether court personnel had attempted to influence the jurors. The court later gave appellants the opportunity to offer evidence of jury tampering, but refused to allow a "fishing expedition" pursued through cross-examination of court security officers.

How best to gather information regarding alleged jury misconduct is a matter of trial court discretion.[13] The judge's questioning reflected a careful attempt to draw the balance required by Rule 606(b), inquiring into objective events that might constitute extraneous influences on the jury, while avoiding any examination of the jury's subjective deliberation process.[14]

The district court also has broad discretion in determining whether to grant the motion for new trial based on jury misconduct.[15] The district court found no evidence that any jurors were biased in favor of the defendants. He found that only two pieces of extraneous information entered the jury room. First, the jurors discussed the fact that a defendant's wife had been treated for mental illness in an institution. Second, one juror reported overhearing a settlement discussion between two of the opposing attorneys. The district court found that these matters were mentioned only briefly, and afterwards the foreman instructed that they could not be considered. The district court concluded, and we agree, that under the circumstances there was no reasonable possibility that this information prejudiced the appellants.

■ The jurors also mentioned other items discussed in the jury room that arguably went beyond the evidence presented at trial. These included such matters as the existence of insurance to pay any judgment, the effect of a verdict on the local economy, the assessment of trial costs in case of a hung jury, and the trebling of damages under RICO. But again, discussion was brief and the jury foreman directed the jurors to proper subjects of consideration.

The district court believed inquiry into these matters was foreclosed by Rule 606(b) as an invasion of the jury's deliberation process. We cannot say that the district court abused its discretion in this judgment, although admittedly the line between consideration of facts not received in evidence and extraneous influence is uncertain at the margins. To the extent the mention of these subjects is considered extraneous information within the exception to Rule 606(b), we find no reasonable possibility of prejudice to the appellants, given the instruction by the court that deliberations were to be confined to the evidence at trial and the credited testimony of the jury foreman that he reminded the jury of its duty to confine itself to the evidence.

C. *Advice of Counsel*

Appellants contend that the district court erred in allowing reliance on advice of

---

13. *Carson v. Polley,* 689 F.2d 562, 580 (5th Cir. 1982); *Martinez v. Food City, Inc.,* 658 F.2d 369, 372 (5th Cir. Unit A Oct.1981).

14. *See Martinez,* 658 F.2d at 373.

15. *Carson,* 689 F.2d at 580.

counsel as a defense, when the court had denied discovery of certain information concerning advice given by counsel. Appellants sought discovery of documents relating to advice given by the law firm of Kirkland & Ellis to the 1981 and 1982 Special Committees. After brief *in camera* review of the documents submitted by appellees, the district court allowed access to all material relating to the 1982 Special Committee, rejecting appellees' claim that the documents were protected by attorney-client privilege. The court did protect documents relating to the 1981 Special Committee, finding attorney-client and work product privileges, and expressing concern for grand jury secrecy. Nevertheless, the court allowed discovery of documents jointly considered by the two committees.

■ Appellants complain that they could not test the foundations of the advice given by Kirkland & Ellis to the 1981 Special Committee. They argue that they were prevented from exploring "the basis for, grounds of, and reliability of the advice received from counsel." However, they do not challenge appellees' right to rely on an advice of counsel defense with respect to disclosures authorized by the 1982 Special Committee. Nor do appellants take exception to the correctness of the instruction regarding advice of counsel. In essence, then, appellants have only the argument that the jury instruction on advice of counsel should have been confined to the 1982 Special Committee. The district court's error, if any, was in failing to tailor the advice of counsel instruction to prevent its application to claims relating to the 1981 Special Committee. But appellants did not ask the district court to narrow the instruction to 1982. Rather, they objected to the advice of counsel instruction "in its entirety," arguing that "we don't believe it would be appropriate under any circumstances to give that instruction here," an objection properly rejected by the district court. For whatever reason, appellants never modified their "all or nothing" stance in objecting to the advice of counsel instruction.

We do not suggest any "error" in counsel's electing not to draw distinctions between the treatment the jury might give to the 1981 and 1982 advice to the Special Committee. We can surmise several plausible and rational trial judgments behind the elected course. Such rationality only reinforces our usual resolve to confine our task as an appellate court to considering the correctness of decisions made by the trial court. Stated another way, there is no injustice or technicality here. Trials abound with tactical choices and injustice is more often the companion of our failing to accept them and allowing shifts in position from trial to appeal. Appellants knew that the advice of counsel defense was proper with respect to advice given to the 1982 Special Committee, since they drew the distinction themselves in a footnote to their pretrial motion on this issue, admitting that they did not seek to bar an advice of counsel defense "where plaintiffs have had opportunity for full discovery regarding such advice." Nevertheless, after the events of trial, appellants sought only the elimination of any such defense from the charge. We will not allow appellants to return on appeal to their pretrial position, having abandoned that position in objecting to the jury instructions.

### D. *Attacks on Counsel*

■ Appellants argue that passion and prejudice infected the verdict, an argument that faces the practical difficulty that the jury deliberated for three weeks. In appellants' view, the jury was inflamed by personal attacks made on their lead counsel in appellees' opening and closing arguments. Appellants also focus on what they characterize as "us-against-them" arguments, allegedly designed to prejudice the jury against appellants' Philadelphia counsel. Appellants objected to the former type of argument, but made no objection to the latter. Appellants did not ask for a mistrial before jury deliberations. Instead, they requested and received a corrective instruction, in which the court emphasized the inappropriateness of attacks by one attorney on another and charged the jury not to consider such attacks for any purpose. We have noted before that a district judge occupies the best position from which

to observe how an attorney's conduct impacts the jury.[16] The decision not to grant a new trial is reviewed under an abuse of discretion standard. Further, the appellants' failure to request a mistrial before the verdict, in essence choosing to gamble on the jury verdict, weighs against a new trial.[17] In these circumstances, we defer to the district court's decision that a new trial was not warranted.

### E. *Insider Trading*

■ Throughout the trial, appellees over objection sought to show that Mr. Walker, one of the class representatives, and Mr. Meyer, who withdrew as a named plaintiff prior to trial, but remained a class member, had traded in Tesoro stock based on inside information. We find no abuse of discretion. The charges of insider trading related to reliance, an essential element of appellants' securities fraud claims.

■ Appellants also challenge the exclusion of evidence regarding a state court lawsuit filed by Tesoro. The lawsuit originally raised claims of insider trading against Meyer and Walker. Tesoro voluntarily dismissed the insider trading charges before trial in that case. Appellants claim that the district court should have permitted evidence regarding the state court suit to show that Tesoro had been unable to prove its charges of insider trading. We find no abuse of discretion in the district court's ruling. Voluntary dismissal of a suit can occur for a variety of reasons. The relevance of the state court action was, thus, marginal, and the district court could

properly exclude the evidence under Fed.R. Evid. 403.

### F. *President Ford*

■ Appellants complain that the district court allowed the jury to view a videotaped deposition of former President Ford, a Tesoro director. The argument is that President Ford had no personal knowledge of the events forming the basis for the lawsuit, and that his evidence consisted primarily of favorable character evidence offered on behalf of Tesoro's CEO. Appellants filed a motion in limine, seeking exclusion of references to President Ford, other than the fact that he is a current director, without first obtaining a ruling from the bench. However, "an objection is required to preserve error in the admission of testimony or the allowance of cross-examination even when a party has unsuccessfully moved in limine to suppress that testimony or cross-examination."[18] Other than the motion in limine, we find no place in the record where appellants objected to President Ford's testimony on the ground that it constituted character evidence inadmissible under Fed.R. Evid. 404(a).[19]

■ Admission of President Ford's testimony regarding his high esteem for Tesoro's CEO was not plain error. Rule 404(a)(1) allows evidence of relevant character traits of an "accused" individual. Such evidence can be admissible in a civil trial raising quasi-criminal allegations

---

16. *Maldonado v. Missouri Pacific Ry. Co.,* 798 F.2d 764, 771 (5th Cir.1986) (quoting *South Hampton Co. v. Stinnes Corp.,* 733 F.2d 1108, 1123 (5th Cir.1984)), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1987).

17. *Id.*

18. *Collins v. Wayne Corp.,* 621 F.2d 777, 785 (5th Cir.1980); *see also Wilson v. Waggener,* 837 F.2d 220, 222 (5th Cir.1988).

19. Appellants only made two objections during the playing of President Ford's deposition, one of which was sustained. The other objection related to two questions regarding the current Board of Tesoro. Appellants objected that the questions were leading and suggestive and that the testimony elicited was irrelevant to the is-

sues in the lawsuit. They did not object to the testimony as being inadmissible character evidence concerning Tesoro's CEO. Nor do we find such an objection in the document entitled Plaintiffs' Objections and Cross Designations Re: Designation of Gerald R. Ford. That document objected generally to introduction of a videotaped deposition, but not to having President Ford's testimony read into the record. It also listed specific objections to portions of the testimony, but did not include the complaint raised here. Further, it raised no objection to the specific portions of the Ford deposition included by appellants in the record excerpts they filed with this court as examples of the objectionable testimony.

against a defendant.[20] In this case, appellants promised during opening argument to show the jury the "sinister dark side of [the CEO]." During trial, Dr. West was accused of obstructing justice, defrauding the government, perjury, and criminal bribery. It was not "plain error" to admit character evidence on his behalf.

Further, President Ford's testimony related to other issues in the trial. He testified concerning the functions of a board of directors and the role of special committees, valuable background for the jury. President Ford was also able to inform the jury of the business and regulatory climate before passage of the post-Watergate Foreign Corrupt Practices Act, when Tesoro made "sensitive payments" to foreign governments.

### G. Costs

■ We agree with the appellants that the district court abused its discretion in awarding the cost of an original and eleven copies of the daily trial transcript. Daily transcript costs may be awarded only upon a finding "that they were not 'obtained primarily for the convenience' of the parties but were 'necessarily obtained for use in this case.' "[21] The district court so found. He reasoned that the complexity and length of the trial, combined with the fact that Tesoro and the nine individual defendants regularly had ten to twelve attorneys in the courtroom, made it necessary to obtain an original and eleven copies of the daily transcript.

In *In re Nissan Antitrust Litigation*,[22] a complicated antitrust case involving a five-week trial, we reversed an award of costs for a daily trial transcript as an abuse of discretion. In this case, the district court divided the defendants into four groups and would only allow one attorney from each group to address any particular issue or cross-examine any particular witness. Thus, while we respect the district court's finding that a daily transcript was necessary, we cannot approve an award of costs for more than four total copies of the daily transcript. Anything more was solely for the convenience of the parties. We find no abuse of discretion with regard to the other costs awarded by the district court.

### III. CONCLUSION

This was a hard fought lengthy jury trial with able lawyers. Appellants received a fair trial and as we see the dispute—it's over. We affirm the judgment below. We also affirm the award of costs except we modify the award of costs for daily copy to include only an original and three extra copies of the daily trial transcript.

AFFIRMED in part, MODIFIED in part.

### Appendix A

Pretrial Order, Plaintiffs' Contentions (excerpt):

By May 16, 1982 ... the 1982 Special Committee decided that the plan to go private could not be implemented because the company would have to disclose the allegations of wrongdoing by Tesoro and West, which would not only expose Tesoro's foreign assets to a significant risk of loss, but would be personally "painful" to West.

Admiral Zumwalt knew West was firmly entrenched in implementing the plan to go private, but the 1982 Special Committee decided it would be best for the company for West himself to withdraw it. Plaintiffs' evidence will show that while the plan to go private was ostensibly withdrawn, West only delayed his ultimate goal. He decided instead to accomplish that objective in a series of steps, the first of which would be a repurchase of stock. A self-tender of Tesoro stock had been discussed earlier, was always a viable option, and could be funded from money readily avail-

**20.** *Carson v. Polley*, 689 F.2d 562, 575–76 (5th Cir.1982).

**21.** *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 713 F.2d 128, 133 (5th Cir.1983) (quoting *Brumley Estate v. Iowa Beef Processors, Inc.*, 704 F.2d 1362, 1363 (5th Cir.1983)).

**22.** 577 F.2d 910, 918 (5th Cir.1978), *cert. denied sub nom. PDQ, Inc. v. Nissan Motor Corp.*, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979).

able. In light of the disclosure problems, though, West knew he could not announce that the tender was the first step in a going private transaction, and he did not. A repurchase, though, would decrease the number of outstanding shares, increase management's ownership percentage, test the water, for the ultimate going private transaction and make a complete tender easier to do later.

Plaintiffs will show, however, that defendants knew the trading price of Tesoro's stock too high [sic] in May because the market was anticipating a reorganization plan from the 1982 Special Committee. West and the others wanted to reduce the price so they could do the tender offer at a much price [sic] and to keep down the trading price of the stock after the tender. Thus, West and management decided to drive down the price of Tesoro stock in advance of the tender, announce a self-tender for ⅓ of the outstanding stock with the money readily available, and then use the proceeds from the later sale of the interests in Trinidad–Tesoro to make further self-tenders. In the interim, it was hoped the grand jury investigation would end, which would permit management to announce it was going private and buy in the remaining stock.

To drive down the price of the stock, West and management decided to announce the so-called two company plan, which was a sham. It was not economically viable, nor could it be implemented without adverse disclosures until the grand jury investigation was favorably resolved. Between May 16 and 26, West, Bloyd and Stewart, who knew the true facts, also represented in public statements that the 1982 Special Committee was still considering reorganization plans and had not yet reached any decision. They drafted the May 27, 1982 press release to make it appear as if it was the recommendation of the 1982 Special Committee. Thereafter, they proceeded to complete the tender at the very same price they had characterized as undervalued just six months earlier.